**EXHIBIT "E"**

# Edwards & Angell LLP

50 State House Square  Hartford CT 06103   860 525 5065   fax 860 527 4198

October 24, 2003

Daniel E. Carpenter, Esq.
Benistar 419 Plan Services, Inc.
Benistar Plaza
100 Grist Mill Road
Simsbury, CT 06070

      Re: **BENISTAR 419 PLAN**

Dear Mr. Carpenter:

This letter is in response to your request for my analysis of the tax and legal authorities affecting the BENISTAR 419 Plan (hereinafter referred to as the "Plan"). You have indicated that the BENISTAR 419 Plan is designed to comply with the provisions of Internal Revenue Code §419A(f)(6).[1] By letter dated December 17, 1998, I rendered to you an opinion that substantial legal authority existed that the Plan as existed at that time complied with the provisions of §419A(f)(6).

Since issuance of that opinion, on July 17, 2003 the Treasury Department issued Final Regulations under §419A(f)(6)[2] (hereinafter referred to as "Final Regulations"). Having considered the impact of the Final Regulations on the BENISTAR 419 Plan, for the reasons set forth below in this letter, it remains my opinion that substantial legal authority exists that the BENISTAR 419 Plan is a plan and remains a plan as described under §419A(f)(6) of the Code. Furthermore, in the event that the IRS should challenge the deductibility of contributions made to the BENISTAR 419 Plan by an employer which participates in the Plan ("Employer") for an eligible employee ("Employee"), it is more likely than not that the Employer will prevail on the following issues:

    1. That the BENISTAR 419 Plan is a plan as described in §419A(f)(6); and

    2. That the Employer is entitled to a current deduction for a contribution to the BENISTAR 419 Plan pursuant to §162(a).

Specifically, in reaching the foregoing conclusions this letter will address and resolve the following issues:

---

[1] References herein to "Section", "§" or "Code" are references to the Internal Revenue Code of 1986 as amended, unless otherwise specified.

[2] 26 CFR 1.419A(f)(6)-1, 68 FR 4254-01 (July 17, 2003).

1. Whether an employer that makes contributions to a welfare benefit plan is entitled to a current deduction under §162.

2. Whether the BENISTAR 419 Plan is a welfare benefit plan.

3. Whether an employer that participates in the BENISTAR 419 Plan is subject to the funding limitations imposed by §§419 and 419A.

4. Whether an employer that makes a contribution to a welfare benefit plan as described in §419A(f)(6) is exempt from the funding, contribution and deduction limitations imposed by §§419 and 419A.

5. Whether the BENISTAR 419 Plan is a welfare benefit plan as described in and which meets the requirements of §419A(f)(6).

In connection with this request, I have reviewed the BENISTAR 419 Plan & Trust document as amended and restated effective January 1, 2003 and the Adoption Agreement for the Plan in blank form (the "Adoption Agreement"). In addition, I have relied upon conversations with officers of BENISTAR 419 Plan Services, Inc., the Sponsor of the Plan, and with officers of BENISTAR Admin Services, Inc., the Administrator of the Plan, who have provided information with regard to the administration of the Plan. Based upon a review and analysis of the foregoing documents and representations made by the Plan's Sponsor and Administrator, the following pertinent facts are relied upon and deemed material in the preparation of the opinions set forth in this letter.

1. The BENISTAR 419 Plan & Trust was established by BENISTAR 419 Plan Services, Inc., which is the Sponsor. The Sponsor determines and selects the Trustee and Administrator of the Plan. No employer, employer group or employee organization were involved with the establishment of the Plan. Therefore, it is not an ERISA plan.

2. The Plan provides only death benefits to eligible Employees participating in the Plan or to their dependants.

3. To join the Plan each Employer must execute an Adoption Agreement identifying those Employees who are eligible to participate in the Plan and the amount of their death benefit. Employers participating in the plan have no rights to modify the terms of the Plan, to appoint or remove the Trustee or Administrator, nor to in any way affect the design, operation or administration of the Plan.

4. The Employer determines the amount of the death benefit to be provided for each eligible Employee, and the Plan Sponsor determines the cost to the Employer to provide the

specified death benefit by reference to the term insurance rates included in Treasury Regulations §1.79-3(d)(2). Once the amount of death benefit has been determined by the Employer and the cost for that benefit has been determined by the Plan Sponsor, both amounts are fixed and cannot be changed or adjusted by either the Employer or the Plan Sponsor.

   5. The Employer is required to pay the benefit cost in a single payment at the time of participation in the Plan. The benefit cost paid by the Employer to the Trust is irrevocable and can never be returned, refunded or rebated to the Employer.

   6. The death benefits provided to eligible Employees under the Plan are provided through age 100 or for so long as the Employee remains an eligible Employee of the Employer, which ever is less.

   7. Benefits under the Plan are payable to the beneficiary of an eligible Employee or family member only in the event of death.

   8. In the event of a covered Employee's separation from employment, benefits under the plan are forfeited, except to the extent conversion rights exist under State law.

   9. Death benefits for eligible Employees are fully reinsured by the Plan through the purchase of individual life insurance policies covering the lives of eligible Employees. The Plan & Trust is named as both the Owner and Beneficiary of all insurance policies purchased.

   10. The Plan Sponsor determines the fixed cost to be charged for the death benefit based upon a rate chart that is reflective of the cost of group term insurance as set forth in Treasury Regulation §1.79-3(d)(2), so that the cost of coverage is the same for all Employers.

   11. The Plan Sponsor files a single Form 5500 with the Internal Revenue Service on behalf of the Plan as a whole.

   12. The Plan currently has and is required to continuously maintain at least 10 participating Employers.

   13. No Employer will normally contribute more than 10% of the total annual contributions to the Plan.

   14. Any gains from the sale or surrender of policies for individuals who lose their eligibility to participate in the Plan will belong to the Trust as a whole and will be applied to cover Trust expenses or reduce the cost of insurance for all Employers on a uniform basis; and

   15. No Employer is directly or indirectly a beneficiary of any policy owned by the Trust.

I have also considered and relied upon the following case law:

- Greensboro Pathology Associates vs. United States, 698 F.2d 1196 (F. Cir.)(1982)
- Wade L. Moser v. Commissioner, T.C. Memo 1989-142 (1989)
- Wellons v. Commissioner, 31 F.3d 569 (3rd Cir. 1994)
- Schneider v. Commissioner, T.C. Memo 1992-24 (1992)
- Booth v. Commissioner, 108 T.C. 524 (1997)
- Neonatology Associates, P.A. v. Commissioner, 115 T.C. 43 (2000), aff'd 299 F.3d 221 (3rd Cir. 1992)

The advice, opinions and conclusions contained in this letter are based on the Code, Treasury Regulations, court decisions, rulings and other authorities existing on the date hereof, as well as the BENISTAR 419 Plan documents and the representations described above. In rendering this opinion, we have not conducted an independent investigation as to the operation of the Plan. Treasury Regulations §1.419A(f)(6)-1(a)(3)(i) requires a plan to comply with §410A(f)(6) in operation and in form.

## A CONTRIBUTION TO A WELFARE BENEFIT PLAN IS ENTITLED TO A CURRENT DEDUCTION UNDER §162

Under §162, a taxpayer may deduct expenses paid as compensation for personal services provided in the course of carrying on a trade or business, as long as the compensation is an ordinary and necessary expense. Treasury Regulation §1.162-10(a) describes a variety of benefits which are included as items of compensation. Included among these are amounts *"paid or accrued within the taxable year for dismissal wages, unemployment benefits, guaranteed annual wages, vacations or sickness, accident, hospitalization, medical expenses, recreational, welfare, or similar benefit plan."* Although death benefits are not specifically listed in the Regulations there does not appear to be any current controversy that such benefits are "similar benefits" for the purpose of deductibility under §162(a).

In Moser, the Government conceded that the death benefit provided under the welfare benefit plan in that case was an appropriate benefit under Regulation §1.162-10 and the Court noted that:

> *"Respondent has not suggested that the other benefit provided by the terms of the VEBA, the death benefit, is not a 'similar benefit' as contemplated in the regulation, and we find that the VEBA's death benefit is a benefit contemplated by*

> *§1.162-10(a), Income Tax Regulations, since that regulation is not meant to prescribe an exclusive list of appropriate benefits that a plan may provide.*"[3]

In General Counsel Memorandum 39440, released in 1985, the Internal Revenue Service acknowledged that contributions to a welfare benefit trust that provides death benefits through individual permanent life insurance policies purchased benefits of the type described in §1.162-10(a) of the Regulations. In both Schneider (1992) and Booth (1997) the Government conceded that the contributions made to provide death benefits under the taxpayers' welfare benefit plans were deductible under §162(a).

Neither §162 nor the Regulations provide specific guidance on what is an ordinary and necessary expense or what is reasonable compensation. Although the Internal Revenue Service technically could contend that the *amount* contributed to a welfare benefit plan is not ordinary or necessary in a particular situation. Such a determination is quite subjective and dependent upon a totality of the facts and circumstances of a particular taxpayer.

In 1984 Congress enacted §§419 and 419A to place limitations on the amounts that employers can deduct for contributions to an employee welfare benefit plan. In enacting these provisions, Congress carved out an exception in §419A(f)(6), which generally exempts an employer from the limitations imposed by §§419 and 419A. The §419A(f)(6) exception provides that the rules of §§419 and 419A do not apply if the plan has more than one employer and no employer normally contributes more than 10%. The exemption does not apply to any plan which maintains experience-rated arrangements with respect to individual employers or to any plan which is a deferred compensation plan.

### THE BENISTAR 419 PLAN IS A WELFARE BENEFIT PLAN
### AND IS NOT A PLAN OF DEFERRED COMPENSATION

To qualify as a welfare benefit plan, the plan may not provide deferred compensation benefits that are deductible under §§404(a)(5) and 404(b). If an employee benefit plan provides a benefit that is certain to be paid to each participating employee, the Internal Revenue Service may attempt to characterize the plan as a deferred compensation plan. On several occasions, the IRS has contended that contributions to welfare benefit plans are not entitled to a current deduction under §162, but rather, such contributions constitute deferred compensation arrangements and thus are subject to the deduction rules under §404. Section 404 provides that a taxpayer is only entitled to a deduction at such time as the employee is required to include the expended amount in his/her income. In Greensboro Pathology the Federal Circuit Court of Appeals held that although all welfare benefit plans contain an element of deferred compensation, in which a future

---

[3] Moser at 25 citing Anesthesia Service Medical Group, Inc. v. Commissioner, 85 T.C 1031, 1043 (1985), aff'd. 825 F 2d 241 (9th Cir. 1987).

## Edwards &-Angell LLP

October 24, 2003
Page 6 of 17

benefit is provided for current services rendered, that does not necessarily mean that the plan is a deferred compensation plan subject to §404. The Appellate Court stated that even the benefits described in Treasury Regulation §1.162-10 provide for deferred compensation yet they are currently deductible.

In Wellons v. Commissioner, 31 F.3d 569 (3rd Cir. 1994), the IRS successfully contended that a plan providing severance benefits was actually a deferred compensation plan subject to the deductibility rules of §404. The Court noted, however, that §404(a) does not apply to contributions made to a plan which provides *"solely"* for welfare benefits.[4] Thus, if a plan provides nothing more than welfare benefits it will be exempt from application of §404.

Central to the Court's determination that the plan in Wellons was a deferred compensation plan was the fact that there existed a certainty that payments would be made to all employees after a certain period of time regardless of the reason for termination. The benefits *vested* after five years of employment and were based upon salary and length of service, which the Court found to be hallmarks of plans subject to §404.[5]

In Booth, the IRS sought to use the Wellons rationale to argue that the Prime Plan was a plan of deferred compensation. The Tax Court, however, ruled in favor of the taxpayer that the plan was in fact a welfare benefit plan. The opinion focused on the severance benefit payable at termination of a participant's employment and the benefits payable upon termination of an employer's participation in the plan and concluded that neither benefit constituted deferred compensation.

The reported cases in which the IRS has taken the position that a welfare benefit plan is actually a deferred compensation plan governed by §404, have generally concerned severance benefit plans.[6] Death benefit plans, however, have consistently been conceded by the IRS to be welfare benefit plans covered by §162. The distinction between the two is due to the unique dual nature of severance plans which under some circumstances are considered welfare benefits while under other circumstances are considered deferred compensation benefits. This unique quality of severance plans was recognized by Congress in enacting ERISA Section 3(2)(B) (29 U.S.C. 1002(2)(B)), which provides:

> *"(B) The Secretary may by regulation prescribe rules consistent with the standard and purposes of this Act providing one or more exempt categories under which -*
>
> *(i) severance pay arrangements....*

---

[4] Wellons at 571.
[5] Wellons at 572.
[6] See Booth, Wellons, Moser and Schneider.

*shall for purposes of this title, be treated as welfare plans rather than pension plans...*

A plan, such as the BENISTAR 419 Plan, that: (i) provides only death benefits; (ii) does not allow for vesting; (iii) distributes benefits only when a participant dies; (iv) provides for the forfeiture of benefits under specified circumstances; (v) does not refund forfeitures to the individual Employers which paid the premiums for the forfeited benefits; and (vi) does not use forfeited policies or contributions to reduce an individual Employer's future contributions, should not be treated as a deferred compensation plan under the rationale set forth in the Booth and Wellons holdings.

Critical to a determination under Booth and Wellons that a plan provides solely welfare benefits and is not a plan of deferred compensation is that benefits cannot vest, there can be no certainty that employees will receive benefits, there must be a real possibility that benefits may be forfeited and that an employer will not benefit from said forfeitures. The BENISTAR 419 Plan complies with each of these requirements. Specifically, in the event an Employee's employment is terminated, benefits under the Plan are forfeited, except to the extent the Employee is granted conversion rights under State law.

Additionally, in the event a participating Employer should terminate participation in the Plan, the Plan may transfer assets and liabilities held by the Plan to a successor welfare benefit plan willing to accept such transfer. The determination of assets and liabilities are based upon an actuarial determination taking into account the assets and liabilities of the Trust as a whole, utilizing standard actuarial assumptions. If no such other welfare benefit plan exists, the covered Employees are permitted the opportunity to continue the death benefit by acquiring insurance policies on their lives for the value of those policies.

Based upon the foregoing, the BENISTAR 419 Plan is a plan providing solely welfare benefits and is not a plan of deferred compensation.

## THE BENISTAR 419 PLAN IS A PLAN DESCRIBED IN §419A(f)(6)

Sections 419 and 419A can limit the deduction for contributions to a trust that funds benefits described in Treasury Regulations §1.162-10(a). However, deductions for contributions to certain types of welfare benefit funds are not limited by §§419 and 419A. Welfare benefit funds described in §419A(f)(6) are exempt from those limits.

A welfare benefit plan is described in §419A(f)(6) if: (1) more than one employer contributes to the plan; (2) no employer normally contributes more than 10% of the total contributions to the plan by all employers; (3) the plan does not maintain experience rating arrangements with

respect to individual employers; and (4) the plan is a "single plan". The Plan Sponsor represents that the BENISTAR 419 Plan has over 1,000 participating employers as of the date of this letter. The Sponsor further represents that no Employer contributes more than 10% of the total annual contributions to the BENISTAR 419 Plan. The Plan documents require the Plan Sponsor to constantly monitor the Plan to insure that these threshold numbers are met and to take appropriate action if it appears that participation and contribution levels place the Plan in jeopardy.

Thus, although the BENISTAR 419 Plan meets the first two requirements, in order to qualify for the exemption under §419A(f)(6): (a) the Plan must be a single multiple employer plan; and (b) the Plan cannot maintain an experience rating arrangement with respect to individual Employers. The Code does not describe how either characteristic is to be determined. The only guidance for determining these two issues are the Booth case and the Final Regulations. The preamble to the Final Regulations states that they "generally clarify existing law," thus, their guidance on the single plan and experience rating issues must be read in conjunction with other legal authorities.

### The Benistar 419 Plan Is A Single Plan

The Final Regulations provide guidance on the application of existing law to determine whether a plan is a single plan rather than an amalgamation of sole employer plans. In this regard the Regulations set forth five characteristics which would tend to indicate that a plan does not meet the requirements of §419A(f)(6). As indicated above, however, these five characteristics are not to be construed as a safe harbor, for the Treasury Department has indicated in the Regulations that whether or not a plan contains, or is devoid of any of the characteristics, is not conclusive.

These five characteristics and the manner in which they impact on the BENISTAR 419 Plan are as follows:

(1) *Allocation of plan assets.* **Assets of the plan or fund are allocated to a specific employer or employers through separate accounting of contributions and expenditures for individual employers, or otherwise.**

All Employer contributions to the BENISTAR 419 Plan are irrevocably made to the Plan and become assets of the Trust. To guarantee the death benefit, the Plan purchases an individual policy of life insurance on the life of each covered Employee. The Plan is both owner and beneficiary of the policies, and neither Employers nor Employees have any interest in the policies. All death benefit claims are obligations of the Trust as a whole. The Plan does not maintain any separate accounts or segregated accounting. Thus, cash and other assets of the Trust are not credited to the participating Employers.

(2) *Differential pricing.* **The amount charged under the plan is not the same for all the participating employers, and those differences are not merely reflective of differences in current risk or rating factors that are commonly taken into account in manual rates used by insurers (such as current age, gender, geographic locale, number of covered dependents, and benefit terms) for the particular benefit or benefits being provided.**

The benefit cost for each Employer in the BENISTAR 419 Plan is the same and is based only on the covered risk assumed by the Plan for each Employee. Once the Employer determines the amount of death benefit to provide, contributions are based on actuarial calculations with respect to insurance rates contained in Table I under Treasury Regulations §1.79-3(d)(2). These rates are determined by general actuarial principles and calculations and are not unique to any specific Employer or group of Employers participating in the Plan. Nor are the rates determined by reference to the premium cost paid by the Plan for individual policies of insurance. The Employer has no discretion to contribute either more or less than the amount determined by the Plan Sponsor utilizing the actuarial calculations described above.

The policies must satisfy the requirements of §7702 so that cash is available to the Trust at the least tax cost since the Trust is a taxable entity. However, the Trust's transactions with the policies does not affect an Employer's contributions.

(3) *No fixed welfare benefit package.* **The plan does not provide for fixed welfare benefits for a fixed coverage period for a fixed cost, within the meaning of paragraph (d)(5) of this section [of the Regulations].**

The BENISTAR 419 Plan provides for a fixed benefit, at a fixed cost, for a fixed period of time. The fixed benefit is as determined by the Adoption Agreement at the time the Employer elects to provide benefits for an eligible employee. The fixed cost is as determined by the Plan Sponsor at the time the Employer elects to provide benefits for an eligible employee. Once the Plan Sponsor determines and the Employer pays the fixed cost, the benefit is guaranteed for so long as the employee remains eligible for benefits. The Employer can never contribute more than the amount determined by the Sponsor and the Sponsor can never request additional contributions, regardless of the claims or investment experience of the Plan. The fixed period for which benefits are guaranteed is the earlier of death or the Employee ceasing to be an eligible Employee. No Employer has any ability, either in the Adoption Agreement or otherwise, to alter the fixed period for which benefits will be paid.

(4) *Unreasonably high cost.* **The plan provides for fixed welfare benefits for a fixed coverage period for a fixed cost, but that cost is unreasonably high for the covered risk for the plan as a whole.**

Utilizing the rate table under Treasury Regulations §1.79-3(d)(2), an actuarially calculated benefit cost is determined. This cost is determined by taking into account the entire covered risk of the Plan. Based upon this formula, a uniform rate chart is used to determine the benefit cost for each eligible Employee. The cost charged by the Plan to provide the specified benefit for each eligible Employee is determined without regard to the costs of any individual policies the Plan may acquire. The amount charged by the Plan is the actuarially determined amount necessary to provide the benefit. Since the amount charged by the Plan is based upon the government's own rate table which is used to determine the value of term insurance, the rate is not inflated by economic benefits in addition to the life insurance, and the cost of the life insurance should be reasonable in relation to the risk insured.

(5) *Nonstandard benefit triggers*. **Benefits or other amounts payable can be paid, distributed, transferred, or otherwise provided from a fund that is part of the plan by reason of any event other than the illness, personal injury, or death of an employee or family member, or the employee's involuntary separation from employment. Thus, for example, a plan exhibits this characteristic if the plan provides for the payment of benefits or the distribution of an insurance contract to an employer's employees on the occasion of the employer's withdrawal from the plan. A plan will not be treated as having the characteristic described in this paragraph merely because, upon cessation of participation in the plan, an employee is provided with the right to convert coverage under a group life insurance contract to coverage under an individual life insurance contract without demonstrating evidence of insurability, but only if there is no additional economic value associated with the conversion right.**

Under the BENISTAR 419 Plan, benefits are only payable in the event of the death of an eligible Employee. If the Employee's employment is terminated, the benefits are forfeited, except to the extent State conversion rights exist.

In the event of an Employer's withdrawal from the Plan, assets and liabilities equal to the value of the policies covering the Employer's eligible Employees and the amount of their death benefits may be transferred to another welfare benefit plan willing to accept the transfer. If no such other plan exists, the Employee has no entitlement to a continuation of the benefit or acquisition of any insurance policies except for the right to obtain the policy on his life at its then value. The exchange of a policy for its value is not a distribution of benefits because it is an exchange for adequate consideration. Thus, as required by the Regulations, the Employer's withdrawal from the Plan does not trigger a distribution of benefits.

The Court in Booth identified nine specific factors which indicated that the Prime Plan was not a single plan but rather was an amalgamation of separate plans.

> "1. *Prime was required to maintain separate accounts and a separate accounting for each Employee Group;*
>
> 2. *the Trust Agreement limited an employee's right to benefits under the Prime Plan to the assets of his or her Employee Group;*
>
> 3. *an annual valuation was performed for each Employee Group's account, and an annual valuation has never been performed for the Trust as a whole;*
>
> 4. *the summary plan description required by section 102 of ERISA was prepared separately for each Employee Group;*
>
> 5. *the arrangement and the adoption agreement signed by each employer were very similar to an arrangement and adoption agreement used by separate employers' establishing a separate plan under the terms of a master plan;*
>
> 6. *each employer selected its employees' level of benefits, vesting schedule, and minimum participation requirements, separate and apart from the selections made by the other employers;*
>
> 7. *each employer's contribution benefited primarily its employees, and not the employees of other employers;*
>
> 8. *the Trust Agreement provided rules under which an employee's benefits would be reduced in the event of a shortfall, and without subsidy from the Trust as a whole; and*
>
> 9. *the Prime Plan did not pool all claim risks within the Trust.*"[7]

The BENISTAR 419 Plan does not contain any of these features. In Booth, the Tax Court interpreted the word 'plan' in §419A(f)(6) to mean a single pool of funds for use by the group as a whole (e.g. to pay the claims of all participants). The key defect in the plan considered in Booth was that a separate account was kept for each employer with the result that each employer's contributions benefited primarily its own employee group. Another result of the separate accounting was that a participant could not look to all of the trust's assets to pay his benefit. This focus by the Tax Court derived from its interpretation of the legislative history of §419A(f)(6), which mentions that the Section was enacted "because the relationship of a participating employer to a 10 or more employer plan typically resembles the relationship of an insured to an insurer".[8] This analysis suggests that the key element in structuring a 10 or more employer plan to qualify under §419A(f)(6) is shifting the risk of loss from the employer to the plan.

---

[7] Booth at 571-572.
[8] H.R. Conf. Rep. No. 861, 98th Cong., 2d Sess. 1159 (1984), 1984-3 C.B. (Vol. 2) 1, 413.

The BENISTAR 419 Plan accomplishes the desired risk shifting (i) by using all of the Trust assets to provide death benefits for all Participants; (ii) by using a uniform rate structure to determine the Employers' contributions; (iii) by making all Employer contributions to the Trust irrevocable; (iv) by making the Trust both owner and beneficiary of any life insurance policies acquired on individual Employees; and, (v) by making the Trust as a whole accountable for experience losses and the beneficiary of experience gains.

The Plan is responsible for paying the death benefit, unless the Employee has committed some act which disqualifies him from the payment of benefits (e.g. suicide, fraud, misrepresentation, etc.) or the Employee's entitlement to benefits has been terminated or been forfeited due to the Employer withdrawing from the Plan. When an Employee ceases participation in the Plan, any proceeds resulting from the surrender of the policy on his life or his acquisition of that policy revert to the Trust as a whole and are not allocated to the Employee's Employer or to any other Employees of the Employer. The proceeds can be used for the payment of Plan expenses.

Additionally, the BENISTAR 419 Plan is only liable for the payment of a death benefit in the amount specified by the Employer in the Adoption Agreement. Thus, whether the Trust's investment or claims experience is positive or negative, a fixed death benefit is paid. This is an entirely different financial arrangement than the one which resulted in the adverse decision in the Booth case in which: (i) each employer was able to determine the terms under which its employees would receive benefits; (ii) no employee group had a right to any contributions or earnings attributable to the employer of another employer group; and (iii) a severed employee could receive less than the promised benefit even though the plan as a whole had enough assets to compensate the employee for the shortage. Accordingly, the BENISTAR 419 Plan is a "single plan" as the Booth decision interprets that term.

### THE BENISTAR 419 PLAN DOES NOT MAINTAIN AN EXPERIENCE RATING ARRANGEMENT

In order for the BENISTAR 419 Plan to qualify for the exemption to §§419 and 419A which are provided by §419A(f)(6), the Plan cannot maintain an experience rating arrangement as to individual Employers. Several Courts, Congress and Treasury pronouncements have previously addressed and described experience rating in general terms, as more fully discussed below.

The Statute, §419A(f)(6), provides that the exemption from the deduction limitations of §§419 and 419A shall not apply to any plan maintaining experience-rating arrangements with respect to individual employers. Since the Statute does not define the term "experience-rating arrangements" its definition must be based upon what Congress understood the term to mean - not what the Treasury Department understands the term to mean eighteen years after the fact.

Edwards & Angell LLP
October 24, 2003
Page 13 of 17

The term "experience rating" was not 'coined' by Congress in the 1984 enactment of §419A(f)(6). The term had a pre-existing history and a common, ordinary definition which Congress is presumed to have known when it used the term. As the Supreme Court has said in describing its interpretation of the word "sale" in the Corn Products case,

> *A "sale" however, is a common event in the non-tax world; and since it is used in the Code without limiting definition and without legislative history indicating a contrary result, its common and ordinary meaning should at least be persuasive of its meaning as used in the Internal Revenue Code. "Generally speaking, the language in the Revenue Act, just as in any statute, is to be given its ordinary meaning, and the words 'sale' and 'exchange' are not to be read any differently." (citations omitted).*[9]

Unlike the terms "capital gain" and "capital asset", the term "experience-rating" is not a creature of the tax law. "Experience-rating", like the term "sale", has a common meaning in the non-tax world. Specifically "experience-rating" is a term which has a generally accepted common meaning within the insurance industry. This has been acknowledged by the Treasury Department. In the Memorandum of issues submitted by Treasury in the Booth case, the IRS stated:

> *"'Experience Rating' is a term of art in the insurance industry, primarily in the area of group insurance. In general, it means that a group's claims experience will be charged against the group's own account. Amounts not used in the group's account in any one accounting period will be available either for return to the policy holder or to be held by the insurer at interest and used for benefits for that group in a subsequent year. The essence of experience rating is the maintenance of a separate account of premiums and claims experience for each group."*[10]

The term "experience rating" has such a common meaning within the insurance industry that neither the Courts, Treasury nor Congress has found a need to define it. The term has been commonly used and understood by the Courts for over 40 years and Congress is deemed to have been aware of its meaning when it used it in §419A(f)(6).[11] Similarly, the Treasury Department has used the terms "experience rated" and "experience rating" in over 75 pronouncements dating

---

[9] Commissioner vs. Brown, 380 U.S. 653 (1965), 570-571.
[10] Booth, *supra*, Respondent's Memorandum of Issues, dated January 31, 1995, Filed February 2, 1995, page 8.
[11] See generally, Professional Insurance Agents of Michigan vs. Commissioner, 726 F.2d 1097 (6th Cir., 1984); New York Telephone Co. vs. New York Sate Dept. of Labor, 440 U.S. 519 (1979); California Dept. of Human Resources Development vs. JAVA, 402 U.S. 121 (1971); Communist Party vs. Catherwood, Industrial Commissioner, 367 U.S. 389 (1961).

back to 1957 and has not found it necessary to define the terms. Moreover, Congress has used these terms in several statutes without definition or a directive to Treasury to define the terms.[12]

The term "experience rated" generally means that premiums (contributions) are adjusted to reflect experience. The Supreme Court has described the term by stating "experience rated...means that the cost of insurance to the group is based on that group's claims experience, rather than general actuarial tables."[13] In Booth, the only case to directly address the experience rating issue in the context of §419A(f)(6), the Court stated:

> *"The essence of experience rating is the charging back of employee claims to the employer's account...Mr. DeWeese [Respondent's Expert] concluded that experience rating may occur by adjusting benefits rather than premiums..."*
> Booth at 575.

The terms 'experience rated" and "experience rating" have long and well established non-tax meanings which significantly predate enactment of §419A(f)(6) and the Final Regulations.

Before the Final Regulations were issued, the Booth case was the only authority to describe experience rating as the term is used in §419A(f)(6). In describing the term the Court reviewed the legislative history of §419A(f)(6).[14] The House Conference Report explains that the reason for the exemption is that the relationship of a participating employer to a 10 or more employer plan typically resembles the relationship of an insured to an insurer.[15] Whereas in an experience rating arrangement, the relationship is more like that of an employer to a fund.

The Court in Booth described the distinction between the insured–insurer and employer–fund relationships in the following terms:

> *"In the typical setting of a self-funded welfare benefit plan, an employer contributes to a fund from which all of its employees' claims are paid; another employer's employees may not recover amounts from the first employer's fund. An insurer in the typical insurer/insured relationship, on the other hand, usually collects premiums from many employers and pays the claims of each of the employer's employees. The insurer typically spreads the risk of claims among all employers by charging each employer a premium commensurate with its covered risk."*[16]

---

[12] See, §419(e)(4)(B), and §3303(f)(2).
[13] U.S. vs. American Bar Endowment, 477 U.S. 105, 107 (1986).
[14] The Final Regulations also base their guidance on the legislative history.
[15] H. Conf. Rept. 98-861, 1159.
[16] Booth at 575.

The opinion concludes that *"[t]he essence of experience rating is the charging back of employee claims to the employer's account."* The Court also noted that according to the IRS's expert witness, Charles DeWeese, experience rating can also occur by adjusting benefits as opposed to adjusting contributions.

The Final Regulations do not alter this result. The Regulations provide that a plan maintains an experience rated arrangement if there is any period of time for which the relationship of contributions under the plan to the benefits or other amounts payable under the plan is or can be expected to be based, in whole or in part, on the benefits experience or overall experience of that employer or one or more employees of that employer. The Regulations echo the decision in Booth, by clarifying that such an arrangement can exist either as a result of an "adjustment of contributions" or an "adjustment of benefit".[17]

As examples of an experience rated arrangement resulting from an adjustment of contributions, the Final Regulations give the following examples:[18]

 (A) An employer is entitled to or can expect a reduction in future contributions if that employer's overall experience is positive;

 (B) An employer can expect its future contributions to be increased if the employer's overall experience is negative;

 (C) An employer is entitled to receive or can expect to receive a rebate of all or a portion of its contributions if that employer's overall experience is positive or, conversely where an employer is liable to make additional contributions if its overall experience is negative

As examples of an experience rated arrangement resulting from an adjustment of benefits, the Final Regulations give the following examples:[19]

 (A) Benefits for an employer's employees are or can be expected to be increased if that employer's overall experience is positive;

 (B) Benefits are decreased if that employer's overall experience is negative;

 (C) Benefits for an employer's employees are limited by reference, directly or indirectly, to the overall experience of the employer (rather than having all the plan assets available to provide the benefits).

---

[17] Treasury Regulation §1.419A(f)(6)-1(b)(1)
[18] Treasury Regulation §1.419A(f)(6)-1(b)(2)
[19] Treasury Regulation §1.419A(f)(6)-1(b)(3)

# Edwards &-Angell LLP

Temporary Regulations under §419 identify the existence of a separate fund for an individual employer (and therefore experience rating) where there is a premium arrangement between an employer and an insurance company pursuant to which the employer has a right to a refund, credit or additional benefits based on the benefit or claims experience, administrative cost experience or investment experience attributable to that employer. Conversely, if separate benefit, administrative cost or investment experience does not entitle an employer to a refund, credit or additional benefits, the arrangement should not be considered a separate fund for the employer and therefore is not an experience rating arrangement.

The provisions of the BENISTAR 419 Plan do not give an Employer the right to a refund, credit or additional benefits and do not allow for adjusting the costs to the Employers or the benefits for the Employees based either upon claims experience or investment experience. Consequently, there is no experience rating in the BENISTAR 419 Plan.

### Additional Issues

Beyond providing guidance on the single plan and experience rating issues, the Final Regulations contain record keeping requirements, definitional provisions and 15 examples. The record keeping provisions requires the plan to be maintained pursuant to a written document and requires the plan administrator to maintain records sufficient to enable the Commissioner and a participating employer to readily verify that the plan satisfies the requirements of §419A(f)(6) and the Final Regulations and with the right, upon written request to inspect an copy all such records. The BENISTAR 419 Plan complies with these requirements.

## CONCLUSION

In order for §419A(f)(6) to apply to the BENISTAR 419 Plan, the Plan cannot maintain an experience rating arrangement, i.e. the Plan cannot determine contributions or benefits for an Employer based on the investment or claims experience peculiar to that Employer. Employer contributions to and employee benefits payable by the BENISTAR 419 Plan are not affected by the experience of a separate account maintained for each participating Employer. Contributions are based on actuarial calculations of insurance rates contained in the Table I under Treasury Regulations §1.79-3(d)(2). These rates are determined by general actuarial principles and calculations and are not unique to any specific Employer or group of Employers participating in the Plan. The Employer has no discretion to contribute either more or less than the amount determined by the Plan Sponsor utilizing the actuarial calculations described above.

The BENISTAR 419 Plan is a single plan for multiple Employers because all assets of the Trust are available to satisfy all claims of covered Employees and their beneficiaries and is not an experience-rating arrangement because the Plan does not provide an Employer with a refund,

credit or additional benefits based on claims experience, administrative cost experience or investment experience peculiar to that Employer. Thus, as long as the 10 or more employer test is met, the BENISTAR 419 Plan should satisfy the requirements of §419A(f)(6), and Employer contributions to the Plan should be deductible under §162. As noted above, this does not constitute an opinion as to the deductibility of contributions by any particular taxpayer, as such must be determined on an individual basis taking into account facts and circumstances unique to individual taxpayers which are beyond the knowledge of the author of this letter.

Sincerely yours,

John H. Reid III

JHR:LAB:jmm