UNITES STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | : | |
| Petitioner, | : | |
| | : | |
| v. | : | CASE NO. 3:08MC111 (RNC) |
| | : | |
| DANIEL CARPENTER, as | : | |
| CHAIRMAN OF BENISTAR LTD, | : | |
| | : | |
| Respondent. | : | |

## RESPONDENT DANIEL E. CARPENTER'S OBJECTIONS TO THE RECOMMENDED RULING ON THE GOVERNMENT'S PETITION TO ENFORCE IRS ADMINISTRATIVE SUMMONS

Pursuant to 28 U.S.C. § 636(b)(1), Rule 72(b) of the Federal Rules of Civil Procedure and Local Rule 72.2, Respondent Daniel E. Carpenter ("Mr. Carpenter" or "Respondent"), submits the following Objections to the recommended ruling regarding the United States of America's ("Government") Petition to Enforce an IRS Administrative Summons ("Summons") issued by Magistrate Judge Martinez, dated October 31, 2012. ("Recommended Ruling") (A copy of the Recommended Ruling is attached hereto as **Exhibit A**).

The Recommended Ruling is clearly erroneous, is based on outdated law, incomplete facts, and a fundamental misunderstanding of unrelated cases, and therefore must be rejected. Pursuant to the applicable rules of law, this Court must "make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1); *see also* FRCP 72(b)(3) ("The district judge must determine *de novo* any part of the Magistrate Judge's disposition that has been properly objected to"); Local Rule 72.2(b) ("the Judge ultimately responsible shall make a de novo determination of those portions of the proposed decision to which objection is made, and may accept, reject, or modify

the recommended ruling in whole or in part. Such independent determination may be made on the basis of the record developed before the Magistrate Judge, and need not ordinarily involve rehearing, although further evidence may also be received in the reviewing Judge's discretion.")

Upon *de novo* review, it will become readily apparent to this Court that it must reject the Recommended Ruling for the following reasons, laid out in objection format pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72(b). Not only should the Court reject the Recommended Ruling but it should quash the Summons in its entirety.

## OBJECTIONS

1. The Recommended Ruling erroneously cites to and relies upon the criteria of *United States v. Powell*, 379 U.S. 48 (1964), without examining the subsequent expansion of *Powell* by the United States Supreme Court in *United States v. LaSalle National Bank*, 437 U.S. 298 (1978) and the Restructuring and Reform Act of 1998, P.L. No. 105-206, §3001, 98th Cong., 1st Sess. (1998). In doing so, the Recommended Ruling fails to address the 2010 search and seizure raid that vitally altered the facts and changed the Government's underlying investigation to a full-fledged criminal investigation. *See also U.S. v. Monsey*, 429 F.2d 1348 (1970).

2. The Recommended Ruling erroneously applies collateral estoppel based on third-party subpoena proceedings not involving this Summons or this Respondent.

3. The Recommended Ruling ignores that all of the information requested in the Summons is now in possession of the Government, as a result of its unreasonable search and seizure raid of April 20, 2010.

## PRELIMINARY STATEMENT

Not only does the Recommended Ruling misapprehend certain facts and the applicable law regarding IRS summonses issued in regard to Code Section 6700, but there have been intervening events that require the Court to quash and dismiss the Summons. For instance, the Recommended Ruling ignores Supreme Court law that requires the Summons to be quashed. *See United States v. LaSalle National Bank*, 437 U.S. 298 (1978); *United States v. Stuart*, 489 U.S. 353 (1989).

The Summons issued in 2004. In 2010, the Government performed an unreasonable search and seizure of the Benistar and Nova Benefit Plan's office at 100 Grist Mill Road in Simsbury, Connecticut on April 20, 2010, pursuant to a sealed search warrant signed by the Honorable Magistrate Thomas P. Smith. (A copy of Sealed Search Warrant signed by Magistrate Thomas P. Smith and Grand Jury Subpoena are attached hereto as **Exhibit B**). (*See Pettibone Tavern, LLC v. Commissioner of Internal Revenue*, pending in the District of Connecticut for further details of the unreasonable and improper search and seizure (hereinafter the "Search Warrant Action")). By law, the mere existence of the Search Warrant Action prevents enforcement of the Summons. Having demonstrated the existence of the Search Warrant Action, which can only be done on the basis of a "criminal" referral to the Justice Department, the Government cannot now enforce the Summons.

As of April 20, 2010, the Government switched from merely investigating potential tax shelter abuse under IRC Section 6700,[1] to sending the referral to the Department of Justice to pursue the Search Warrant Action. The Recommended Ruling fails to address the critical fact of the Search Warrant Action altogether and the fact that, pursuant to the Supreme Court's rulings in *LaSalle* and *Stuart*, the Summons cannot now be enforced. (*See* **Exhibit A**, pp. 8-9).

---

[1] If applicable, this would have resulted in a penalty of at most $1,000. *See* IRC Section 6700.

Since April 20, 2010, both Benistar and Nova Benefit Plans have spent millions of dollars in legal fees fighting the Government. Mr. Carpenter, a former officer of Benistar, is well within his rights to decline to answer any questions involving the welfare benefit plans, pursuant to his right against self-incrimination under the Fifth Amendment.

Inexplicably, Magistrate Judge Martinez fails to examine the *LaSalle* factors, which, as confirmed by the Supreme Court in *Stuart*, expands the four factors of *United States v. Powell*, 379 U.S. 48 (1964) and compels quashing of the Summons issued here.

Under *LaSalle*, which is wholly ignored by Magistrate Judge Martinez, to obtain enforcement of an administrative summons, the IRS must establish in good faith that: (1) the investigation will be conducted for a legitimate purpose; (2) the inquiry is relevant to that purpose; (3) the material sought is not already within the government's possession; (4) the administrative steps required by the Internal Revenue Code and applicable regulations have been followed; and (5) **the Government cannot pursue a summons to gather evidence for a criminal investigation and that no criminal referral regarding the taxpayer's case has been made to the Department of Justice**. *LaSalle* at 313-314; *Stuart* at 358-362, *Powell* at 57-58. (Emphasis added). The Recommended Ruling also ignores TEFRA, which the Supreme Court made clear in *Stuart* "also requires that the IRS not have referred the case to the Justice Department for possible criminal prosecution." 489 U.S. at 358.

At this point in time, the Government fails on several of the *Lasalle* factors, if not all five, when it must comply with all of them to be able to enforce a summons. Thus, the Court is obligated to quash the Summons because of the pendency of the pending Search Warrant Action (*see U.S. v. Monsey*, 429 F.2d 1348 (1970)) and because the Summons cannot possibly be answered because most of the information that the IRS asks for is presently at the IRS office in

Milwaukee, Wisconsin, having been seized pursuant to an over-the-top and unreasonable search and seizure that is the subject of the Search Warrant Action being litigated in Hartford, Connecticut. Mr. Carpenter is asking only for this Court to do the right thing, which is to quash this Summons because the IRS has failed to establish all of the five factors required for the enforcement of a Summons after the unreasonable and illegal search and seizure of April 20, 2010, which opened the pending Search Warrant Action.

The Summons is also inappropriate because the Government is using its power improperly. In *Cadwell v. Commissioner*, 136 T.C. No. 2 (2011), and *Schwab v. Commissioner*, 136 T.C. No. 6 (2011), the Tax Court acknowledges that it decided three separate cases addressing individual Section 419A(f)(6) welfare plans without ruling on whether the individual plan in each case met the requirements of Section 419A(f)(6). This only further supports the Respondent's position that the IRS is not trying to shed light on any tax return (because there is none at issue here) or trying to assess any penalty under Section 6700 (the investigation has been ongoing for over 10 years), but rather is using this Summons as a way to add more names to the IRS audit "grist mill," not only without ever reviewing the validity of the plans that it investigates, but also without ever giving a taxpayer the protections mandated by Section 7609(f) of the IRS Restructuring and Reform Act of 1998. This is prohibited, even for the United States Government.

As summed up in *xélan, Inc. v. United States of America*, No. M-04-83, Order filed Feb. 7, 2005:

> **If the sole purpose of the summons was to find other taxpayers for the IRS gristmill the information sought from AmerUs would not be relevant to [IRS Agent] Higgins' investigation which concerns only the conduct of xélan in marketing the 419 Program and its compliance with various statutory requirements. In such a case, the identity of other participants could be obtained from AmerUs by administrative summons, if at all, only**

through a **"John Doe" summons under the procedure outlined in IRC §7609(f)**. The "John Doe" summons process requires, among other things, a court proceeding at which the IRS must establish a reasonable basis for believing that a group or class of unidentified persons may fail, or may have failed, to comply with the internal revenue laws. Because unidentified persons have no opportunity to institute proceedings to quash such a summons, §7609(f) substitutes the Court to "take the place of the affected taxpayer" in order to "exert a restraining influence on the IRS" through the required findings.

(Emphasis added).[2]

## ARGUMENT

I.  **THE RECOMMENDED RULING IGNORES THE SIGNIFICANT INTERVENING FACT OF THE 2010 SEARCH WARRANT ACTION, WHICH IS HIGHLY RELEVANT AFTER THE SUPREME COURT'S DECISION IN *UNITED STATES V. LASALLE NAT'L BANK*, 437 U.S. 298 (1978)**

Once there is a criminal referral, as in this case, to obtain the Search Warrant, the IRS discovery process must come to a halt. *See Pickel v. U.S.*, 746 F.2d 176, 183 (3d Cir. 1984) (stating that the summons power ends when the IRS makes a Justice Department referral). The IRS summons power is extinguished when an investigation is referred to the Department of Justice. *See* 26 U.S.C. §7602(d)(1) ("No summons may be issued under this title…with respect to any person if a Justice Department referral is in effect with respect to such person."); *see also Scotty's Contracting and Stone, Inc. v. United States*, 326 F.3d 785, 788 (6th Cir. 2003). The issuance of a sealed search warrant for the illegal raid that is the subject of the Search Warrant Action is the sort of referral to the Justice Department that absolutely negates the IRS summons power under § 7602. Now that Mr. Carpenter has been made the subject of a criminal grand jury investigation, the improper, irrelevant, and illegitimate government discovery that is the focus of

---

[2] Indeed, the volume of "credible" evidence produced by Mr. Carpenter in *Curcio v. Commissioner,* T.C. Memo 2010-115 (2010), dwarfs by any comparison the amount of evidence produced in the three leading cases of this decade dealing with the issue of "shifting of the burden of proof to the IRS" since the enactment in 1998 of Section 7491 by the Restructuring and Reform Act of 1998, P.L. No. 105-206, §3001, 98th Cong., 1st Sess. (1998). Since Section 6700 involves a penalty, the burden of proof, production, and appropriateness is also against the Government and IRS under Section 7491(c). Nowhere does the Magistrate even mention § 7491.

the Summons must be stopped as a matter of law. *See United States v. LaSalle Nat'l Bank*, 437

U.S. 298, 318 (1978); *Stuart* 489 U.S. 358.

More importantly, the Tax Equity and Fiscal Responsibility Act of 1982 (TEFRA) makes

clear that as soon as there is any type of criminal investigation involved, the IRS' power to issue

administrative summonses is immediately curtailed. S. Rep. No. 494, 97th Cong., 2d Sess. 286

(1982).

TEFRA draws a "bright-line" delineating that the summons power ends at the point the

investigation is referred to the Department of Justice. The legislative history of TEFRA supports

the conclusion that once a criminal reference is made, the **IRS may not continue to pursue** a

civil summons on the same subject matter:

> The committee expects that the Justice Department will continue to have
> primary responsibility for criminal prosecutions under the tax laws and that the
> Internal Revenue Service *will not use its summons authority to pursue a civil or
> criminal investigation **after** the case subject to investigation is referred* …. S.
> Rep. No. 494, 97th Cong., 2d Sess. 286 (1982) (Emphasis added).

Mr. Carpenter respectfully submits that in a system of justice that strives to achieve a

balance of power between the Government and those citizens accused of federal offenses, that

balance is unconstitutionally and irremediably thrust in favor of the Government when it is

permitted to leverage an ongoing civil IRS administrative proceeding to further an ongoing

criminal investigation. *See Wardius v. Oregon*, 412 U.S. 470, 474 (1973) ("Although the due

process clause has little to say regarding the amount of discovery which the parties must be

afforded, it does speak to the balance of forces between the accused and his accuser.")

Recognizing the tension that exists when a civil party is the subject of criminal

prosecution or investigation, one accepted ground for quashing a summons or issuing a

protective order in a civil case is the pendency of parallel or related criminal proceedings. *See*

*Digital Equip. Corp. v. Currie Enter.*, 142 F.R.D. 8, 14-15 (D. Mass. 1991) ("[The] court may, in

lieu of a general stay, impose protective orders, seal interrogatories, impose a stay for a finite

period of time, or limit a stay to a particular subject matter."); *see also United Tech. Corp. v.

Dean*, 906 F. Supp. 27, 29 (D. Mass 1995) (staying testimonial discovery of former employee, in

former employer's federal civil action arising from employee's alleged embezzlement, pending

outcome of parallel state criminal proceeding). The decision of whether to stay or limit

discovery in a civil case because of a pending criminal action often involves a balancing of

interests.

Here, the balance tips in Mr. Carpenter's favor because, not only is there a criminal

investigation pending, but, as discussed in greater detail below, the Government is in possession

of all of the documents to show the information it seeks from the issuance of the old Summons in

2004. Since that time, and as was provided to Magistrate Judge Martinez, Mr. Carpenter answer

all but 4 of the 51 questions, on two separate occasions. *See* **Exhibit C**.

Magistrate Judge Martinez relies exclusively on a 1962 case which allowed a subpoena to

be enforced even after the commencement of a criminal investigation. *See In re Magnus, Mabee

& Reynard, Inc.*, 311 F.2d 12 (2d Cir. 1962, *cert. denied*, 373 U.S. 902 (1963). In that case, the

Government was compelled to commence a criminal indictment to prevent the "criminal statute

of limitations from running." *Id.* at 16. Thus, the Court found that the civil subpoena should not

be voided or quashed given that the Government had to start the criminal proceedings or forfeit

that right. In this case, the Government was not forced to make its unreasonable search and

seizure raid by any alleged statute of limitation, and in fact, despite the guns blazing approach, it

has not made any indictments almost three years later. Thus, respectfully, Magistrate Judge

Martinez's reliance on *Magnus* without an analysis of that case is simply too thin a reed to justify

ignoring Mr. Carpenter's incontrovertible due process rights.

Further, the *Magnus* decision has been seriously questioned for the very same reasons. In

*U.S. v. Monsey*, 429 F.2d 1348 (1970), the Seventh Circuit rejected the reasoning in the *Magnus*

case. In addressing civil subpoenas issued before the issuance of a criminal indictment, the

Seventh Circuit expressly found that the criminal proceedings trumped the previously issued

civil subpoenas:

> Enforcement would be equally objectionable where the judicial action would itself effect an abuse of the summons. Events subsequent to administrative issuance may change circumstances to such an extent that enforcement of a summons may bring about improprieties. Such equitable considerations demand that the court consider intervening occurrences as well as the status quo at the date of issuance. These principles call here for consideration of the supervening indictment and postponement of civil claims. Cognizance of those facts does no more violence to administrative process than does inquiry into the good faith of the summons or contentions of harassment. **To the extent that In re Magnus, Mabee & Reynard, Inc., may suggest a contrary conclusion, we reject its reasoning.**

429 F.2d 1348, 1351 (Emphasis added) (internal quotation omitted).

## II. THE RECOMMENDED RULING ERRONEOUSLY APPLIES COLLATERAL ESTOPPEL TO CASES WHERE MR. CARPENTER WAS NOT A PARTY

The Recommended Ruling must also be rejected because it improperly applies collateral

estoppel based on cases involving different respondents and different third party subpoenas. In

*Taylor v. Sturgell*, 128 S. Ct. 2161, 2170-72 (2008), the Supreme Court stated: "A person who

was not a party to a suit generally has not had a 'full and fair opportunity to litigate' the claims

and issues settled in that suit. The application of claim and issue preclusion to nonparties thus

runs up against the 'deep-rooted historic tradition that everyone should have his own day in

court.' *Richards*, 517 U.S. at 798 (internal quotation marks omitted). Indicating the strength of

that tradition, we have often repeated the general rule that 'one is not bound by a judgment *in*

*personam* in a litigation in which he is not designated as a party or to which he has not been made a party by service of process.'" *Hansberry v. Lee*, 311 U.S. 32, 40 (1940).

The Recommended Ruling states that issue preclusion does indeed apply because Judge Margolis "determined that Benistar was attempting to relitigate different issues at different times that had previously been litigated in the S.D.N.Y. and E.D. Pa. Benistar actions." (*See* Recommended Ruling, p. 7). Yet, Benistar's actions regarding third-party subpoenas have no bearing on the Summons at issue here.

## III. THE GOVERNMENT HAS IN ITS POSSESSION ALL OF THE INFORMATION IT IS SEEKS IN THE SUMMONS

As noted above, on April 20, 2010, 72 heavily-armed IRS-CID agents executed a raid on the peaceful business campus of 100 Grist Mill Road, where Nova Benefit Plans currently operates. These agents seized 322 boxes of information involving various welfare benefit plans. To date, only four boxes have been returned. The rest of the boxes remain in custodial storage of Halloran & Sage, LLP in Hartford, Connecticut, and the IRS-CID office in Milwaukee, Wisconsin or in the FBI office in Meriden, Connecticut.

The only information that Mr. Carpenter has refused to give in the past was the names of the participants or participating employers in the Benistar 419 Plan. The Government has all of those names now, and has proceeded to audit the participants and send out large tax bills without first looking at the merits of the Benistar 419 Plan.[3]

As the Recommended Ruling states, "[t]he IRS is entitled, and it is a legitimate purpose to summon, original documents so as to check their consistency and completeness with those obtained elsewhere." (*See* Recommended Ruling, p. 10). Mr. Carpenter submits to this Court

---

[3] In fact, in a 2011 Tax Court case *Cadwell v. Commissioner*, 136 T.C. No. 2, *17 (2011), the Tax Court stated: "This Court has decided several cases regarding purported section 419A(f)(6) plans...without deciding whether the plans in issue met the requirements of section 419A(f)(6)...."

that all of the original documents sought by the Summons are in one of three places: Halloran & Sage, LLP in Hartford, Connecticut, the IRS-CID office in Milwaukee, Wisconsin or the FBI office in Meriden, Connecticut. The documents are in those respective locations as a direct result of the Search Warrant Action commenced by the Department of Justice.

Accordingly, though the Government may be able to seek the production of documents it already possesses in certain limited cases (*see United States v. Linsteadt*, 724 F.2d 480, 483-84 (5th Cir. 1984), it should not be able to do so when the sole reason that the documents are not in the possession of Mr. Carpenter is because of the Government's illegal and unreasonable search and seizure. For the Government to seek to enforce the Summons to obtain documents it knows Mr. Carpenter does not have is nothing more than a bullying tactic, done for alternative reasons, or simply to harass Mr. Carpenter and put the Benistar 419 Plan out of existence. Moreover, even a cursory glance at **Exhibit C** shows that Mr. Carpenter answered the Summons, professionally and completely (except for the names) over eight years ago. Now that the Search Warrant has been issued based on a referral to the Justice Department, Federal law prohibits the enforcement of the IRS Summons. Respectfully, Magistrate Martinez got it wrong, and the Summons at issue must be quashed.

## CONCLUSION

Based on the foregoing, Mr. Carpenter respectfully requests that this Court not adhere to Magistrate Judge Martinez's Recommended Ruling and enter an order quashing the Summons in its entirety.

Respectfully submitted,

*Respondent, Daniel Carpenter*

*/s/ Joseph M. Pastore III*
Joseph M. Pastore III (ct11431)
Pastore Shofi & Dailey, LLC
4 High Ridge Park, Third Floor
Stamford, CT 06905
203-658-8454 (tel)
203-348-0852 (fax)
jpastore@psdlaw.net

*******
The Graybar Building
420 Lexington Avenue, Suite 300
New York, NY 10177
212-297-6169 (tel)
212-986-1952 (fax)

*Counsel for Respondent*

## <u>CERTIFICATION</u>

     The undersigned certifies that on the 28th day of November 2012, the foregoing was filed electronically and notice of this filing will be sent by email to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's CM/ECF System.

                                             */s/ Joseph M. Pastore III*
                                             Joseph M. Pastore III

# EXHIBIT
# A

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

|                              |   |                          |
|------------------------------|---|--------------------------|
| UNITED STATES OF AMERICA,    | : |                          |
|                              | : |                          |
|     Petitioner,              | : |                          |
|                              | : |                          |
| v.                           | : | CASE NO. 3:08MC111(RNC)  |
|                              | : |                          |
| DANIEL E. CARPENTER, as      | : |                          |
| chairman of Benistar, Ltd.,  | : |                          |
|                              | : |                          |
|     Respondent.              | : |                          |

RECOMMENDED RULING ON PETITION
TO ENFORCE IRS ADMINISTRATIVE SUMMONS

Pending before the court is the government's petition to enforce the Internal Revenue Service ("IRS") administrative summons ("Carpenter summons") issued in September 2004 to the respondent, Daniel E. Carpenter, chairman of Benistar, Ltd. (Doc. #1.)  District Judge Robert N. Chatigny referred the petition to the undersigned for a recommended ruling.  (Doc. #3.)  For the reasons set forth below, the court recommends that the petition be granted.

A.  Background

According to the declaration of Revenue Agent Charles Clark, the IRS is investigating whether Carpenter and his related companies (collectively, "Benistar") promoted an abusive tax shelter in violation of 26 U.S.C. § 6700 by telling potential clients that contributions to two of Benistar's

employee welfare benefits plans ("Plans") were tax deductible.[1]
(Doc. #1, Ex. 2.)   In December 2003, the IRS issued an
Information Document Request to Carpenter.  He replied with
written responses and objections.  (Doc. #13, Ex. 10.)   In April
2004, the IRS issued an administrative summons directing
Carpenter to appear at a deposition in September 2004 and to
bring certain records for examination.  (Doc. #1, Ex. 2 at 8-
16.)  Carpenter did not appear and sent written objections to
the summons requests.  (Id. at 17-26.)  Agent Clark avers that
the IRS obtained some (but not all) of the summoned records from
Carpenter and obtained additional records by issuing third-party
summonses to banks that held the Plans' accounts.  (Id at 5-6.)

Benistar challenged the third-party summonses in several
venues.  In the Southern District of New York, Benistar entities
moved to quash a summons served on JP Morgan.  Judge Miriam
Goldman Cedarbaum held extensive oral argument (see Hearing Tr.,
doc. #13, Ex. 2 and 3) before denying the motion to quash and a
subsequent motion for reconsideration, and the Second Circuit

---

[1]Section 6700 imposes certain penalties on a person or
company that organizes or participates in the sale of an
investment plan and who makes a "false or fraudulent" statement
as to "the allowability of any deduction . . . by reason of . .
. . participating in the plan . . . ."  26 U.S.C. § 6700(a).   In
this case, the investigation concerns how Benistar marketed two
welfare benefits plans, the Benistar 419 Plan & Trust and the
Severance Trust Executive Program & Trust.  The IRS is
investigating what Benistar told its clients, amounts of
deductions taken by employers participating in the Plans, and
whether the Plans qualified for deductibility of contributions.

affirmed.  Benistar 419 Plan Services, Inc. v. United States,
No. 04cv4308, 2004 WL 2601274 (S.D.N.Y. October 26, 2004),
aff'd, 144 Fed. Appx. 902 (2d Cir. 2005).  Similarly, in the
Eastern District of Pennsylvania, Benistar entities moved to
quash a summons served on Wachovia Bank.  Judge Charles R.
Weiner denied their motion to quash "for the reasons stated from
the bench by Judge Cedarbaum in the companion case."  Benistar
419 Plan Serv., Inc. v. United States, No. 04cv2494, 2004 U.S.
Dist. LEXIS 29744, *1 (E.D. Pa. Dec. 22, 2004).

In the District of Connecticut, Benistar entities moved to
quash a summons issued on Hartford Life.  Magistrate Judge Joan
Glazier Margolis recommended denial of the motion to quash,
finding that the motion was barred by collateral estoppel,
having been previously litigated before Judge Cedarbaum, and
that Benistar would not prevail on the merits regardless.
Benistar Employer Serv. Trust Co. v. United States, No.
3:04cv2197(JBA), 2005 WL 3429423 (D. Conn. May 12, 2005).  The
recommended ruling was adopted, 2005 WL 3429409 (D. Conn. Aug.
19, 2005), and the Second Circuit affirmed, 184 Fed. Appx. 93
(2d Cir. 2006).

In April 2008, the government filed the pending petition
seeking enforcement of the Carpenter summons with respect to
outstanding records not in the possession of the IRS.  (Doc.
#1.)

B. Legal Standard

Pursuant to 26 U.S.C. § 7602(a), the IRS may in good faith issue a summons in order to determine, inter alia, the liability of any person for any internal revenue tax and collect any such tax liability.  The validity of a § 7602 summons is determined as of the date it was issued.  In re Magnus, Mabee & Reynard, Inc., 311 F.2d 12, 16 (2d Cir. 1962), cert. denied, 373 U.S. 902 (1963).  To establish that a summons has issued in good faith, the IRS must demonstrate prima facie that (1) the investigation has a legitimate purpose; (2) the material sought is relevant to that purpose; (3) the material sought is not already within the possession of the IRS; and (4) the administrative steps required by the Internal Revenue Code have been satisfied.  United States v. Powell, 379 U.S. 48, 57-58 (1964).

Once the IRS has made the prima facie showing, the burden shifts to the respondent to "disprove one of the four Powell criteria, or to demonstrate that judicial enforcement would be an abuse of the court's process."  Adamowicz v. United States, 531 F.3d 151, 156 (2d Cir. 2008) (internal quotation marks omitted).  This "heavy" burden requires the taxpayer to "disprove the actual existence of a valid civil tax determination or collection purpose by the IRS."  Id.  An abuse of the court's process occurs "if the summons ha[s] been issued for an improper purpose, such as to harass the

4

taxpayer or to put pressure on him to settle a collateral
dispute, or for any other purpose reflecting on the good
faith of the particular investigation." Powell, 379 U.S. at
58.

   C.  Discussion

   The government's affidavit (doc. #1, Ex. 2 at 1-7)
establishes prima facie that the summons was issued as part of a
legitimate § 6700 investigation of Benistar, that the summoned
records were relevant to the investigation, that the IRS does
not possess all of the summoned records, and that the IRS
complied with the proper administrative steps.  See Adamowicz v.
United States, 531 F.3d 151, 156 (2d Cir. 2008) (IRS affidavit
is sufficient prima facie showing).  The burden therefore shifts
to Carpenter to disprove one of those four criteria or to
demonstrate that enforcement would be an abuse of process.

   1.  Delay in Enforcement

   Noting that nearly four years passed between the date of
the summons and the date of the petition, Carpenter contends
that the government should be equitably barred from enforcing
the summons.  (Doc. #12 at 5.)  The Second Circuit has held that
continued enforcement of a § 7602 summons is proper so long as
the taxpayer's liability has not been finally determined.  PAA
Mgmt., Ltd. v. United States, 962 F.2d 212, 217-18 (2d Cir.
1992).  It reasoned that to prevent enforcement of a § 7602

5

summons because of the passage of time "would encourage

litigants to resist such summonses wholly for the purpose of

delay." In re Magnus, Mabee & Reynard, Inc., 311 F.2d 12, 16

(2d Cir. 1962).  Here, the length of the investigation of

Benistar is due in part to Benistar's resistance to various

administrative summonses, including litigation in multiple

venues and two appeals.  There is no indication that the IRS has

reached a final determination of Benistar's liability;

therefore, continued enforcement of the Carpenter summons is

proper.

## 2. Improper Purpose

Turning to the first Powell criterion, Carpenter argues

that the IRS's investigation is a pretext to discover the

identities of Benistar's clients without having to comply with

the more burdensome procedures of a John Doe summons.[2]  He

alleges that if the IRS truly intended to determine the legality

---

[2]A John Doe summons seeks information from unidentified
parties and requires additional showings and procedures not
required for other third-party summonses.  See 26 U.S.C. §
7609(f).  "The 'John Doe' summons process requires, among other
things, a court proceeding at which the IRS must establish a
reasonable basis for believing that a group or class of
unidentified persons may fail, or may have failed, to comply
with the internal revenue laws.  Because unidentified persons
have no opportunity to institute proceedings to quash such a
summons, § 7609(f) substitutes the Court to 'take[ ] the place
of the affected taxpayer' in order to 'exert[ ] a restraining
influence on the IRS' through the required findings."  Xélan,
Inc. v. United States, 397 F. Supp. 2d 1111, 1120 (S.D. Iowa
2005) (quoting Tiffany Fine Arts, Inc. v. United States, 469
U.S. 310, 321 (1985)).

of the Plans, it already could have done so.  The government

responds that the doctrine of collateral estoppel precludes

Carpenter from raising this issue in this proceeding.

> Collateral estoppel, or issue preclusion, bars the
> relitigation of issues actually litigated and decided
> in the prior proceeding, as long as that determination
> was essential to that judgment.  See Beck v. Levering,
> 947 F.2d 639, 642 (2d Cir. 1991) (per curiam), cert.
> denied sub nom., Levy v. Martin, 504 U.S. 909, 112 S.
> Ct. 1937, 118 L. Ed. 2d 544 (1992).  Four elements
> must be met for collateral estoppel to apply: (1) the
> issues of both proceedings must be identical, (2) the
> relevant issues were actually litigated and decided in
> the prior proceeding, (3) there must have been 'full
> and fair opportunity' for the litigation of the issues
> in the prior proceeding, and (4) the issues were
> necessary to support a valid and final judgment on the
> merits.

Central Hudson Gas & Elec. Corp. v. Empresa Naviera Santa S.A.,

56 F.3d 359, 368 (2d Cir. 1995).

In her recommended ruling on Benistar's motion to quash a

third-party summons related to the investigation, Judge Margolis

determined that Benistar was attempting to relitigate issues

that had been previously litigated in the S.D.N.Y. and E.D. Pa.

Benistar actions.  She ruled that "the issues of whether the

four factors of the Powell test have been satisfied, whether the

special John Doe procedures of § 7609(f) were applicable, and

whether enforcement of the summons would constitute an abuse of

the court's process by inappropriately forcing [Benistar] out of

business, are now precluded from further adjudication in this

pending Petition."  Benistar Employer Serv. Trust Co. v. United

States, No. 3:04cv2197(JBA), 2005 WL 3429423, at *4 (D. Conn. May 12, 2005), adopted, 2005 WL 3429423 (D. Conn. May 12, 2005), aff'd, 184 Fed. Appx. 93 (2d Cir. 2006).

Carpenter maintains that issue preclusion does not apply to this proceeding because certain facts have "vitally altered" since Judge Margolis's decision. See Comm'r of Internal Revenue v. Sunnen, 333 U.S. 591, 600 (1948) (where situation vitally altered between time of first judgment and the second, prior determination not conclusive); Montana v. United States, 440 U.S. 147, 159 (1979) ("changes in facts essential to a judgment will render collateral estoppel inapplicable in a subsequent action raising the same issues"). However, the "new facts" alleged by Carpenter were considered in prior proceedings. First, although the summons at issue here is directed to a principal of Benistar as opposed to a third party as in the prior cases, Judge Margolis previously concluded that the identity of the summoned party does not affect the analysis because all of the Benistar proceedings "involve the same underlying IRS investigation" which Benistar is attempting to defeat "by using the same arguments that it previously asserted." Benistar, 2005 WL 3429423, at *4. Second, although one of the IRS declarations in this case made a legal misstatement, this same misstatement was considered by Judge Cedarbaum. Affirming Judge Cedarbaum, the Second Circuit

8

expressly ruled that the misstatement did not invalidate the investigation.  See Benistar 419 Plan Serv., Inc., 144 Fed. Appx. at 904.  Third, even assuming that the IRS has begun to audit some of Benistar's clients as Carpenter predicted, this does not alter the factual landscape.  The Second Circuit affirmed that the client list is relevant to the investigation of Benistar and, therefore, even if another motivation for the summons is to investigate Benistar's clients, the existence of that second purpose does not render the first purpose pretextual.  See Benistar 419 Plan Serv., Inc., 144 Fed. Appx. at 904 (2d Cir. 2005) (citing Tiffany Fine Arts, Inc. v. United States, 469 U.S. 310, 321 (1985)(where summons serves dual purposes of investigating both known and unknown taxpayers, John Doe summons not required)).

In sum, Carpenter identifies no new facts that would render collateral estoppel inapplicable.  Because the legitimacy of the underlying Benistar investigation was litigated fully in prior proceedings, Carpenter is precluded from relitigating it here.

### 3.  Records in Possession of IRS

Addressing the third Powell criterion, Carpenter argues that the IRS already possesses the requested records.  He maintains that he previously produced all the relevant records in response to the 2003 Information Document Request except for the client list, which the IRS subsequently obtained from third

9

parties.  In support, he submits a copy of his answers to the

2003 Information Document Request.

     "[T]he 'already possessed' exception to the enforcement of

Internal Revenue summonses is narrowly construed such that even

where some information may be technically in the IRS's

possession, if the bulk of the materials summoned is not

demonstrably in the possession of the IRS, the summons may be

properly enforced."  Id., quoting United States v. Linsteadt,

724 F.2d 480, 483-84 (5th Cir. 1984) (quotation marks omitted).

Carpenter fails to demonstrate that the bulk of the original

summoned materials are in the IRS's possession.  Although there

may be some redundancy between the summoned documents and

documents produced in response to the 2003 Information Document

Request, "that in itself does not require a finding that the

summonses should be quashed."  Adamowicz v. United States, 531

F.3d 151, 159 (2d Cir. 2008).  Additionally, production of the

client list is still proper even if the IRS already obtained the

list from third-party sources.  "The IRS is entitled, and it is

a legitimate purpose to summon, original documents so as to

check their consistency and completeness with those obtained

elsewhere."  United States v. Administration Co., 94cv2057, 1994

WL 240518 (N.D. Ill. May 31, 1994) (citing United States v.

Davey, 543 F.2d 996, 1001 (2d Cir. 1976) ("the government is

entitled to use the original records for purposes of

verification rather than be forced to accept purported copies,

which present the risk of error or tampering")).  Accord. Cohen

v. United States, 306 F. Supp. 2d 495, 504 (E.D. Pa. 2004);

Xélan, Inc. v. United States, 397 F. Supp. 2d 1111, 1117-18

(S.D. Iowa 2005).  As a result, Carpenter fails to carry his

burden as to the third factor.

### 4. Mootness of Investigation

Carpenter also contends that the summons is moot in light

of recent Tax Court rulings regarding the legality of the Plans.[3]

Because the summons issued before the rulings were made, they

have no bearing on its validity.  See In re Magnus, Mabee &

Reynard, Inc., 311 F.2d 12, 16 (2d Cir. 1962) (validity of §

7602 summons is determined as of date of issue).  Nor does the

substance of the rulings moot the investigation regardless.  The

legality of one of the Plans is still at issue, as are the

questions of how Benistar promoted the Plans and what penalty it

might owe under § 6700.  See, e.g., Benistar 419 Plan Serv.,

Inc, 144 Fed. Appx. at 903 (2005) (voluntary remedial measures

do not moot investigation into Benistar's past violations).

---

[3]The Tax Court determined in 2010 that that one of the
Benistar Plans was an abusive tax shelter, McGehee Family
Clinic, P.A. v. Comm'r of Internal Revenue, T.C.M. (RIA) 2010-
202, 2010 WL 3583386 (2010), and that contributions to the Plans
were not deductible as ordinary business expenses, Curcio v.
Comm'r of Internal Revenue, T.C.M. (RIA) 2010-115, 2010 WL
2134321 (2010).

   5.  Objections to Specific Requests

Finally, in his original response to the Carpenter summons,
Carpenter objects to certain document requests as irrelevant,
overly broad and subject to privilege.  None of these objections
is availing.  Carpenter makes no showing with respect to
privilege and, as Judge Margolis stated, the court "is not
obliged to engage in speculation as to whether a document or
portions thereof could be privileged."  Benistar Employer Serv.
Trust Co., 2005 WL 3429423, at *7 (emphasis retained).
Additionally, a § 7602 summons request is relevant if it "might
throw light upon" the matter being investigated.  Id.; see also
United States v. White, 853 F.2d 107, 112 (2d Cir. 1988).
Finally, as to overbreadth, "[t]he judges in this circuit have .
. . construed the [IRS] summons power liberally, and allowed it
to extend to widely-sweeping document requests."  United States
v. Arthur Young, 677 F.2d 211 (2d Cir. 1982), aff'd in relevant
part, 465 U.S. 805, 813-15 (1984).  The requests in the
Carpenter summons satisfy these deferential standards.

   D.  Conclusion

For the foregoing reasons, the court recommends that the
government's petition, doc. #1, be granted.

Any party may seek the district court's review of this
recommendation.  See 28 U.S.C. § 636(b) (written objections to
proposed findings and recommendations must be filed within

                              12

fourteen days after service of same); Fed. R. Civ. P. 6(a), 6(d) & 72; Rule 72.2 of the Local Rules for United States Magistrate Judges, United States District Court for the District of Connecticut; Thomas v. Arn, 474 U.S. 140, 155 (1985); Frank v. Johnson, 968 F.2d 298, 300 (2d Cir. 1992).  Failure to timely object to a magistrate judge's report will preclude appellate review.  Small v. Sec'y of Health and Human Serv., 892 F.2d 15, 16 (2d Cir. 1989).

SO ORDERED at Hartford, Connecticut this 31st day of October, 2012.

_____/s/_____
Donna F. Martinez
United States Magistrate Judge

# EXHIBIT
# B

United States District Court

DISTRICT OF _____ **CONNECTICUT** _____

| | |
|---|---|
| **In the Matter of the Search of** **(Name, address or Brief description of person, property or premises to be searched)** | **APPLICATION AND AFFIDAVIT FOR SEARCH WARRANT** |
| | **CASE NUMBER:** |

The office of NOVA BENEFIT PLANS LLC, also known as BENISTAR, located at 100 Grist Mill Road, Simsbury, Connecticut.

I **_Shaun Schrader_** being duly sworn depose and say:

I am a(n) **IRS-CID Special Agent** and have reason to believe that __ on the person of or **x** on the property or premises known as (name, description and/or location)

The office of NOVA BENEFIT PLANS LLC, also known as BENISTAR, located at 100 Grist Mill Road, Simsbury, Connecticut, 06070. The property is described as a single story office building. The lower portion of the building consists of red brick and windows, while the upper portion of the building consists of horizontal gray siding. The property is accessed by a short driveway off of Grist Mill Road. At the bottom of the driveway is a red brick structure with a sign attached to it that says "100 GRIST MILL RD." At the top of the driveway, as you approach the parking lot, is a wooden sign that reads "DIRECTORY, ENTRANCE 1, BENISTAR." There is no signage on the exterior of the building itself.

in the _____ District of _____ **CONNECTICUT** _____
there is now concealed a certain person or property, namely (describe the person or property to be seized)

*See* Attachment B.

**which is (state one or more bases for search and seizure set forth under Rule 41(b) of the Federal Rules of Criminal Procedure)**

fruits, evidence, and/or instrumentalities

concerning violations of Title 18 United States Code, Section 371 and Title 26 United States Code, Section 7206(2)
**The facts to support a finding of Probable Cause are as follows:**

*See* attached Affidavit.

**Continued on the attached sheet and made a part hereof.** X Yes __ No

X _____

Signature of Affiant,
Special Agent Shaun Schrader, IRS-CID

Sworn to before me, and subscribed in my presence

April **16** 2010 _____
**Date**

at _____ Hartford, Connecticut _____
**City and State**

Hon. Thomas P. Smith, U.S. Magistrate Judge
**Name and Title of Judicial Officer**

_____
Signature of Judicial Officer

# EXHIBIT
# C



# BENISTAR

**BENISTAR 419 PLAN SERVICES, INC.**
BENISTAR PLAZA
100 GRIST MILL ROAD
SIMSBURY, CT 06070

May 26, 2004

<u>Via Federal Express</u>

Mr. Dominick Servadio, Jr.
Treasury Department
Internal Revenue Service
212 W. Main Street
Suite 201
Salisbury, MD 21801

Re: **Benistar Information Document Request No. 1**

Dear Mr. Servadio:

Please find enclosed updated answers to Information Document Request No. 1 acknowledging your receipt and acceptance of certain materials already previously provided. There are, however, a number of questions in this IDR that are redundant, repetitive and immaterial as to whether or not a plan is as described under IRC Section 419A(f)(6). For this reason, there will always be a lot of "No Responsive Documents" in the response column as we all as our standard objections.

In the past I have suggested questions that would be more conducive to a study of whether a plan is a welfare benefit plan under Section 419A(f)(6), but to my dismay the same 51 questions keep coming back in more or less the same format. For example, Questions 21-23 seem to be asking the same question. Likewise, since you accepted our answer to Question 37, why wouldn't you also approve our answer to Question 38. You must admit the questions are very similar, if not exactly the same.

In any event, we wish to be cooperative, and we wish to comply, but sometimes the answer really is "No Responsive Documents." Please do not hesitate to call if I can be of further service in this regard.

All the best,

*Daniel E Carpenter*

Daniel E. Carpenter

Enclosures

cc:   Steve Pavlick
      William Goldman
      Christopher Rizek

## BENISTAR and BENISTAR 419 PLAN SERVICES, INC.'s
## RESPONSE TO IRS IDRs DATED DECEMBER 19, 2003

1)      Identify all BENISTAR 419 PLANS by name of the plan and provide the dates during which such plans were sold, promoted, managed, or administered by you. *Previously provided.*

2)      Provide a complete copy of all documents establishing, creating, or implementing each of the BENISTAR 419 PLANS. If the documents have been updated, revised, or otherwise modified since the inception of the plans, provide copies of all versions of the documents. *Previously provided.*

3)      For each of the BENISTAR 419 PLANS identify all persons who have participated in or who are currently participating in each plan. If a person is no longer participating in a plan, provide the dates of their participation. *BENISTAR objects to this Request as it seeks information that is protected by third parties rights to privacy and seeks information that is protected by the work product, trade secret, or other applicable privilege, seeks confidential and/or proprietary information and seeks information that is irrelevant and immaterial to this investigation and whether the BENISTAR 419 Plan is a plan as described under IRC Section 419A(f)(6).*

4)      Provide all files maintained with respect to each participant in the BENISTAR 419 PLANS. *BENISTAR objects to this Request as it is overly broad and unduly burdensome, seeks information that is protected by third parties' rights to privacy, and seeks information that is protected by the work product, trade secret, or other applicable privilege, and seeks confidential and/or proprietary information and seeks information that is irrelevant and immaterial to this investigation and whether the BENISTAR 419 Plan is a plan as described under IRC Section 419A(f)(6).*

5)      Provide copies of all promotional materials or other documents used in connection with the BENISTAR 419 PLANS, including prospectuses, brochures, seminar materials, newsletters, web site content, proposals, illustrations, cost/benefit analyses, financial analyses, financial projections, expense projections, benefit projections, premium refund projections, tax benefit analyses, payout illustrations relating to participants or other persons and any comparisons with other forms of investments. In addition to printed materials, all promotional materials in the form of videotapes, CD-ROMs, DVDs, and audiotapes are included in this request. *Previously provided.*

6)      Identify all persons participating in or responsible for the sales, marketing, or other promotion of the BENISTAR 419 PLANS. *No Responsive Documents. The BENISTAR 419 Plan has no sales, marketing or promotional departments, therefore, no Responsive Documents.*

7) Identify all persons participating in or responsible for the management, administration, and operation of the BENISTAR 419 PLANS. *No Responsive Documents.*

8) If any of the entities associated with the BENISTAR 419 PLANS is a trust, provide a completed and signed Form 56, Notice Concerning Fiduciary Relationship, for the current trustee of each trust. *Previously provided.*

9) If any of the BENISTAR 419 PLANS operate as a trust provide the purpose of the trust and identify the person or persons who controls the funds of the trust, who has the power to distribute the trust's income, and who controls the trust assets. *See Response to Request 10.*

10) Provide all documents describing the purpose of the BENISTAR 419 PLANS and any related trusts. *Previously provided.*

11) Provide all documents describing the operation of the BENISTAR 419 PLANS and any related trust. *See Previously provided.*

12) Provide all documents setting forth the organizational structure of the BENISTAR 419 PLANS. *Previously provided.*

13) Provide all documents containing or constituting a request, direction, requisition for monies, certification or instruction submitted to the trustees of the BENISTAR 419 PLAN trusts. *BENISTAR objects to this Request on the basis that it is unclear and it seeks information that is irrelevant and immaterial to this investigation and whether the BENISTAR 419 Plan is a plan as described under IRC Section 419A(f)(6). No Responsive Documents.*

14) Provide the minutes of all director or shareholder meetings for each entity associated with the BENISTAR 419 PLANS from inception of the entity to the present, including all records regarding the appointment and/or resignations/terminations of any entity official, records of all assets transferred into any entity, and all records regarding the ownership of all shares of beneficial interest in any entity. *BENISTAR objects to this request on the grounds that it seeks information that is irrelevant and immaterial to this investigation and whether the BENISTAR 419 Plan is a plan as described under IRC Section 419A(f)(6). No Responsive Documents.*

15) Provide all operations manuals, training manuals, or other documents detailing the operations of the BENISTAR 419 PLANS and related trusts and the responsibilities of their employees, officers, principals and/or agents. This request includes, but is not limited to, all documents upon which these individuals rely in the performance of their daily responsibilities for the BENISTAR 419 PLANS and related trusts. *BENISTAR objects to this request on the grounds that it seeks information that is irrelevant and immaterial to this investigation and whether the BENISTAR 419 Plan is a plan as described under IRC Section 419A(f)(6). No Responsive Documents.*

7)      Identify all persons participating in or responsible for the management, administration, and operation of the BENISTAR 419 PLANS. *No Responsive Documents.*

8)      If any of the entities associated with the BENISTAR 419 PLANS is a trust, provide a completed and signed Form 56, Notice Concerning Fiduciary Relationship, for the current trustee of each trust. *Previously provided.*

9)      If any of the BENISTAR 419 PLANS operate as a trust provide the purpose of the trust and identify the person or persons who controls the funds of the trust, who has the power to distribute the trust's income, and who controls the trust assets. *See Response to Request 10.*

10)      Provide all documents describing the purpose of the BENISTAR 419 PLANS and any related trusts. *Previously provided.*

11) Provide all documents describing the operation of the BENISTAR 419 PLANS and any related trust. *See Previously provided.*

12) Provide all documents setting forth the organizational structure of the BENISTAR 419 PLANS. *Previously provided.*

13)      Provide all documents containing or constituting a request, direction, requisition for monies, certification or instruction submitted to the trustees of the BENISTAR 419 PLAN trusts. *BENISTAR objects to this Request on the basis that it is unclear and it seeks information that is irrelevant and immaterial to this investigation and whether the BENISTAR 419 Plan is a plan as described under IRC Section 419A(f)(6). No Responsive Documents.*

14)      Provide the minutes of all director or shareholder meetings for each entity associated with the BENISTAR 419 PLANS from inception of the entity to the present, including all records regarding the appointment and/or resignations/terminations of any entity official, records of all assets transferred into any entity, and all records regarding the ownership of all shares of beneficial interest in any entity. *BENISTAR objects to this request on the grounds that it seeks information that is irrelevant and immaterial to this investigation and whether the BENISTAR 419 Plan is a plan as described under IRC Section 419A(f)(6). No Responsive Documents.*

15)      Provide all operations manuals, training manuals, or other documents detailing the operations of the BENISTAR 419 PLANS and related trusts and the responsibilities of their employees, officers, principals and/or agents. This request includes, but is not limited to, all documents upon which these individuals rely in the performance of their daily responsibilities for the BENISTAR 419 PLANS and related trusts. *BENISTAR objects to this request on the grounds that it seeks information that is irrelevant and immaterial to this investigation and whether the BENISTAR 419 Plan is a plan as described under IRC Section 419A(f)(6). No Responsive Documents.*

16)     Identify all documents provided to, or made available to, prospective or actual participants in the BENISTAR 419 PLANS regarding the professional qualifications or experience of BENISTAR and its employees, agents, and other persons responsible for the BENISTAR 419 PLANS. *No Responsive Documents.*

17)     Provide all documents, including those in electronic or digital format, detailing the operation and maintenance of the BENISTAR website(s). Identify all persons responsible for the content, design, maintenance, and updates of the web site, and copies of all pages contained on the web site as of the date of this request. *BENISTAR objects to this request on the grounds that it seeks information that is irrelevant and immaterial to this investigation and whether the BENISTAR 419 Plan is a plan as described under IRC Section 419A(f)(6). No Responsive Documents.*

18)     Provide all documents discussing the federal tax implications or consequences of participating in the BENISTAR 419 PLANS including, but not limited to the tax treatment of payments to and receipt of funds from the BENISTAR 419 PLANS and upon withdrawal and termination of participation in the plans. *No Responsive Documents.*

19)     Provide all legal opinions, written for or used by BENISTAR, with respect to the BENISTAR 419 PLANS and related trusts. *Previously provided.*

20)     Provide all audited or unaudited financial statements for the BENISTAR 419 PLANS and related trusts from their inception to present. *Previously provided.*

21)     Provide all documents discussing the procedures for and the tax and other consequences of the participating employer's termination of and/or withdrawal from the BENISTAR 419 PLANS and related trusts. *See Documents Provided in Response to Request 10.*

22)     Provide all documents discussing the procedures and circumstances for termination and/or withdrawal from participation in the BENISTAR 419 PLANS. *No withdrawals are allowed from the BENISTAR 419 Plan. See Documents Provided in Response to Request 10.*

23)     Provide all documents discussing the procedures for and consequences of the termination of the BENISTAR 419 PLANS. *See Documents Provided in Response to Request 10.*

24)     Provide all documents pertaining to payments made by or on behalf of participants to the BENISTAR 419 PLANS and related trusts. *BENISTAR objects to this Request on the basis that it is unclear and it seeks information that is irrelevant and immaterial to this investigation and whether the BENISTAR 419 Plan is a plan as described under IRC Section 419A(f)(6). No payments are made by participants to the BENISTAR 419 Plan. No Responsive Documents.*

25)     Provide all documents detailing the manner in which the BENISTAR 419 PLANS and related trusts invested or used funds it received from participants or from any other person. This request includes, but is not limited to, all investment account statements, life insurance cash accumulation and/or premium reserve account statements and/or electronic databases containing this information.  *BENISTAR objects to this request on the grounds that it seeks information that is irrelevant and immaterial, is overly broad and unduly burdensome, seeks information that is protected by third parties' rights to privacy, and seeks information that is protected by the work product, trade secret, or other applicable privilege, and seeks confidential and/or proprietary information.  Subject to and without waiving these objections, the finalized Regulations dealing with §419A(f)(6) clarifies that "Neither Section 419A(f)(6) nor these regulations regulate the investments of a welfare benefit fund, including investments by a trust in cash value policies." Nothing in the Regulations precludes any type of investment by the Sponsor of a welfare benefit plan. Additionally, all employer contributions are assets of the Trust and the composition of the Trust's investment portfolio is irrelevant.*

26)     Provide all documents discussing the nature, type and amount of benefits provided through the BENISTAR 419 PLANS and related trusts including insurance policy contracts and investment fund statements.  This request includes, but is not limited to, Summary Plan Descriptions, certificates of coverage, and account statements.  *See Response to Request 25 above.*

27)     Provide all documents describing the procedures and practices for shifting, distributing or sharing all benefit, investment and/or any other risk or risks by or within the BENISTAR 419 PLANS and related trusts. *See Documents Provided in Response to Request 10.*

28)     Provide all documents detailing the shifting, distributing or sharing of benefit, investment and/or other risks by or within the BENISTAR 419 PLANS.  *No Responsive Documents other than those provided in Response to Request 10.*

29)     Provide all documents describing the procedures and practices for commingling or pooling assets by or within the BENISTAR 419 PLANS and related trusts. *All funds are commingled in one trust account. All assets are available to pay all claims.  See Documents Provided in Response to Request 10.*

30)     Provide all documents detailing the commingling or pooling assets by or within the BENISTAR 419 PLANS and related trusts. *See Response to Request 29.*

31)     Provide all documents describing the qualifying benefit events and the procedures and practices for the disposition of benefit claims under the BENISTAR 419 PLANS and related trusts. *See Documents Provided in Response to Request 10.*

32)     Provide all documents detailing the payment of benefits by the BENISTAR 419 PLANS and related trusts. *No Responsive Documents.*

33)    Provide all documents explaining the circumstances that might or did cause a loss or forfeiture of benefits under the BENISTAR 419 PLANS and related trusts. *See Documents Provided in Response to Request 10. Employers have forfeited contributions due to failure in making premium payments.*

34)    Provide all documents describing the events that would result in payment, or that has resulted in actual payment, by BENISTAR or any person related to BENISTAR to participating employers or their employees other than through the payment of a death benefit under the BENISTAR 419 PLANS and related trusts. *None. Death Benefit only. No Responsive Documents.*

35)    Provide all documents indicating the status as of December 31, 2000, 2001, 2002, and 2003 of life insurance products or policies purchased by the BENISTAR 419 PLANS and related trusts. This request includes, but is not limited to, the date the life insurance product was acquired; the date it was transferred and the identity of the person to whom it was transferred; the date it lapsed, was terminated or converted; and/or the date any payments were received with respect to the insurance product. *BENISTAR objects to this request on the grounds that it seeks information that is irrelevant and immaterial, is overly broad and unduly burdensome, seeks information that is protected by third parties' rights to privacy, and seeks information that is protected by the work product, trade secret, or other applicable privilege, and seeks confidential and/or proprietary information. Subject to and without waiving these objections, the finalized Regulations dealing with §419A(f)(6) clarifies that "Neither Section 419A(f)(6) nor these regulations regulate the investments of a welfare benefit fund, including investments by a trust in cash value policies." Nothing in the Regulations precludes any type of investment by the Sponsor of a welfare benefit plan. Additionally, all employer contributions are assets of the Trust and the composition of the Trust's investment portfolio is irrelevant.*

36)    Provide all documents identifying the life insurance premium rates with respect to any policies purchased by the BENISTAR 419 PLANS and related trusts on behalf of any employer participant or their employees from the inception of the plans to present. *BENISTAR objects to this request on the grounds that it seeks information that is irrelevant and immaterial, is overly broad and unduly burdensome, seeks information that is protected by third parties' rights to privacy, and seeks information that is protected by the work product, trade secret, or other applicable privilege, and seeks confidential and/or proprietary information. See Response to Request 35. No Responsive Documents.*

37)    Provide all documents listing the commissions and other fees or administrative charges paid to BENISTAR or to any person with respect to the participants in the BENISTAR 419 PLANS. *BENISTAR objects to this request on the grounds that it seeks information that is irrelevant and immaterial, is overly broad and unduly burdensome, seeks information that is protected by third parties' rights to privacy, and seeks information that is protected by the work product, trade secret, or other applicable privilege, and seeks confidential and/or proprietary information. See Response to Request 35. This answer was accepted.*

38)    Provide all documents listing the commissions and other fees paid by, or on behalf of BENISTAR to any person, broker, or agent for services performed in securing an employers' participation in the BENISTAR 419 PLANS and related trusts, or the purchase of life insurance products by the trusts on behalf of the employer participants. *BENISTAR objects to this request on the grounds that it seeks information that is irrelevant and immaterial, is overly broad and unduly burdensome, seeks information that is protected by third parties' rights to privacy, and seeks information that is protected by the work product, trade secret, or other applicable privilege, and seeks confidential and/or proprietary information. See Response to Request 35. No Responsive Documents. But Request number 37 was approved.*

39)    Provide all documents detailing all occasions in which a payment of a benefit from the BENISTAR 419 PLANS under the life insurance products was funded or supplemented by assets other than those purchased with the premiums paid by or on behalf of the participant receiving the benefit. *BENISTAR objects to this Request on the basis that it is unclear and it seeks information that is irrelevant and immaterial to this investigation and whether the BENISTAR 419 Plan is a plan as described under IRC Section 419A(f)(6). See Response to Request 35. No Responsive Documents.*

40)    Provide all documents detailing the payments under the BENISTAR 419 PLANS to employees of participants or participants other than through the payment of a death benefit under the life insurance products. *No Responsive Documents. Death Benefit Only.*

41)    Provide all documents detailing the reinsurance of any death benefits under any of the life insurance products purchased with premiums paid by or on behalf of participants in the BENISTAR 419 PLANS. This request includes, but is not limited to, reinsurance treaties. *BENISTAR objects to this request on the grounds that it seeks information that is irrelevant and immaterial, is overly broad and unduly burdensome, seeks information that is protected by third parties' rights to privacy, and seeks information that is protected by the work product, trade secret, or other applicable privilege, and seeks confidential and/or proprietary information. See Response to Request 35. No Responsive Documents; although the BENISTAR 419 Plan itself reinsures its death benefit risk with major insurance carriers.*

42)    Provide all documents used by the BENISTAR 419 PLANS or related trusts to select the insurance providers or insurance products obtained on behalf of, or for the benefit of, participants. *BENISTAR objects to this request on the grounds that it seeks information that is irrelevant and immaterial to this investigation and whether the BENISTAR 419 Plan is a plan as described under IRC Section 419A(f)(6). See Response to Request 35. No Responsive Documents.*

43)    For the tax years 2000 through 2003, provide all documents relating to the preparation and/or filing of Forms 990, 1041, 5500 and/or 5500-C/R prepared and/or filed by or on behalf the BENISTAR 419 PLANS, the entities associated with the administration of the plans, and the participants in the plans. *Previously provided.*

44)     Provide all account statements, deposit slips, debit credit memos, cancelled checks, and similar documents from First Union National Bank, J .P .Morgan, or other trustee or financial institution, for the BENISTAR 419 PLAN and related trusts from the inception of the plans to present. *BENISTAR objects to this request on the grounds that it seeks information that is irrelevant and immaterial, is overly broad and unduly burdensome, seeks information that is protected by third parties' rights to privacy, and seeks information that is protected by the work product, trade secret, or other applicable privilege, and seeks confidential and/or proprietary information. Subject to and without waiving these objections, the finalized Regulations dealing with §419A(f)(6) clarifies that "Neither Section 419A(f)(6) nor these regulations regulate the investments of a welfare benefit fund, including investments by a trust in cash value policies." Nothing in the Regulations precludes any type of investment by the Sponsor of a welfare benefit plan. Additionally, all employer contributions are assets of the Trust and the composition of the Trust's investment portfolio is irrelevant.*

45)     Provide all accounting books and records for each BENISTAR 419 PLAN entity from inception of the plans to present, including, but not limited to check registers, disbursements journals, receipts journals, general ledger, and other workpapers used in the preparation of the tax return(s) and financial statement(s). *BENISTAR objects to this request on the grounds that it seeks information that is irrelevant and immaterial, is overly broad and unduly burdensome, seeks information that is protected by third parties' rights to privacy, and seeks information that is protected by the work product, trade secret, or other applicable privilege, and seeks confidential and/or proprietary information. Subject to and without waiving these objections, the finalized Regulations dealing with §419A(f)(6) clarifies that "Neither Section 419A(f)(6) nor these regulations regulate the investments of a welfare benefit fund, including investments by a trust in cash value policies." Nothing in the Regulations precludes any type of investment by the Sponsor of a welfare benefit plan. Additionally, all employer contributions are assets of the Trust and the composition of the Trust's investment portfolio is irrelevant. No Responsive Documents.*

46)     Provide all documents pertaining to financing transactions, including but not limited to, loan applications, loan agreements, promissory notes, deeds of trust, security agreements, payment records, and financial statements submitted by the BENISTAR 419 PLANS, related trusts, or related BENISTAR entities to any lender for transactions entered into from the inception of the plans to present. *No Responsive Documents.*

47)     Provide copies of all income tax returns for each entity involved in the BENISTAR 419 PLANS from the inception of the plans to present. *Previously provided.*

48)     All of your payroll tax returns, Forms 940 and 941, for the tax 2000 through 2003. *There are no payroll returns or payroll. No responsive documents.*

49)     Provide copies of any information returns issued by BENISTAR, the BENISTAR 419 PLANS and related trusts. This request includes, but is not limited to, Forms W-2, W-2P, W-4, 1099-MISC, 1099-INT and 1099-R pertaining to each employee for each entity involved in the BENISTAR 419 PLANS and related entities for the years 2000 through 2003. *BENISTAR objects to this request on the grounds that it seeks information that is irrelevant and immaterial, is overly broad and unduly burdensome, seeks information that is protected by third parties' rights to privacy, and seeks information that is protected by the work product, trade secret, or other applicable privilege, and seeks confidential and/or proprietary information.*

50)     Provide all documents maintained to satisfy the "Compliance Information" requirements of Treasury Regulation §1.419A(f)(6)-1(a)(2). Treasury Regulation §1.419A(f)(6)-1(a) states that "A plan is a 10 or more employer plan described in section 419A(f)(6) only if it is a single plan - (iv) That satisfies the requirements of paragraph (a)(2) of this section." Section (a)(2) Compliance Information states "A plan satisfies the requirements of this paragraph (a)(2) if the plan is maintained pursuant to a written document that requires the plan administrator to maintain records sufficient for the Commissioner or any participating employer to readily verify that the plan satisfies the requirements of section 419A(f)(6) and this section and that provides the Commissioner and each participating employer ...with the right, upon written request to the plan administrator, to inspect and copy all such records." *Previously provided.*

51)     Treasury Regulation §1.419A(f)(6)-1(c)(2) through (c)(6) describe five(5) "Characteristics indicating a plan is not a 10 or more employer plan." Those characteristics are: 1) Allocation of plan assets, 2) Differential pricing, 3) No fixed welfare benefit package, 4) Unreasonably high cost, and 5) Nonstandard benefit triggers. For all BENISTAR 419 Plans, provide a written narrative addressing whether the BENISTAR 419 Plans possess any of the characteristics described in this regulation. Provide all supporting documentation. **These five characteristics and the manner in which they impact on the BENISTAR 419 Plan are as follows:**

(1)     *Allocation of plan assets.* Assets of the plan or fund are allocated to a specific employer or employers through separate accounting of contributions and expenditures for individual employers, or otherwise.

**All Employer contributions to the BENISTAR 419 Plan are irrevocably made to the Plan and become assets of the Trust. To guarantee the death benefit, the Plan purchases an individual policy of life insurance on the life of each covered Employee. The Plan is both owner and beneficiary of the policies, and neither Employers nor Employees have any interest in the policies. All death benefit claims are obligations of the Trust as a whole. The Plan does not maintain any separate accounts or segregated accounting. Thus, cash and other assets of the Trust are not credited to the participating Employers.**

(2)     *Differential pricing.* The amount charged under the plan is not the same for all the participating employers, and those differences are not merely reflective of differences in current risk or rating factors that are commonly taken into account in manual rates used by

insurers (such as current age, gender, geographic locale, number of covered dependents, and benefit terms) for the particular benefit or benefits being provided.

The benefit cost for each Employer in the BENISTAR 419 Plan is the same and is based only on the covered risk assumed by the Plan for each Employee. Once the Employer determines the amount of death benefit to provide, contributions are based on actuarial calculations with respect to insurance rates contained in Table I under Treasury Regulations §1.79-3(d)(2). These rates are determined by general actuarial principles and calculations and are not unique to any specific Employer or group of Employers participating in the Plan. Nor are the rates determined by reference to the premium cost paid by the Plan for individual policies of insurance. The Employer has no discretion to contribute either more or less than the amount determined by the Plan Sponsor utilizing the actuarial calculations described above.

The policies must satisfy the requirements of §7702 so that cash is available to the Trust at the least tax cost since the Trust is a taxable entity. However, the Trust's transactions with the policies does not affect an Employer's contributions.

(3)     *No fixed welfare benefit package.*   The plan does not provide for fixed welfare benefits for a fixed coverage period for a fixed cost, within the meaning of paragraph (d)(5) of this section [of the Regulations].

The BENISTAR 419 Plan provides for a fixed benefit, at a fixed cost, for a fixed period of time. The fixed benefit is as determined by the Adoption Agreement at the time the Employer elects to provide benefits for an eligible employee. The fixed cost is as determined by the Plan Sponsor at the time the Employer elects to provide benefits for an eligible employee. Once the Plan Sponsor determines and the Employer pays the fixed cost, the benefit is guaranteed for so long as the employee remains eligible for benefits. The Employer can never contribute more than the amount determined by the Sponsor and the Sponsor can never request additional contributions, regardless of the claims or investment experience of the Plan. The fixed period for which benefits are guaranteed is the earlier of death or the Employee ceasing to be an eligible Employee. No Employer has any ability, either in the Adoption Agreement or otherwise, to alter the fixed period for which benefits will be paid.

(4)     *Unreasonably high cost.*   The plan provides for fixed welfare benefits for a fixed coverage period for a fixed cost, but that cost is unreasonably high for the covered risk for the plan as a whole.

Utilizing the rate table under Treasury Regulations §1.79-3(d)(2), an actuarially calculated benefit cost is determined. This cost is determined by taking into account the entire covered risk of the Plan. Based upon this formula, a uniform rate chart is used to determine the benefit cost for each eligible Employee. The cost charged by the Plan to provide the specified benefit for each eligible Employee

is determined without regard to the costs of any individual policies the Plan may acquire. The amount charged by the Plan is the actuarially determined amount necessary to provide the benefit. Since the amount charged by the Plan is based upon the government's own rate table which is used to determine the value of term insurance, the rate is not inflated by economic benefits in addition to the life insurance, and the cost of the life insurance should be reasonable in relation to the risk insured.

(5) *Nonstandard benefit triggers.* Benefits or other amounts payable can be paid, distributed, transferred, or otherwise provided from a fund that is part of the plan by reason of any event other than the illness, personal injury, or death of an employee or family member, or the employee's involuntary separation from employment. Thus, for example, a plan exhibits this characteristic if the plan provides for the payment of benefits or the distribution of an insurance contract to an employer's employees on the occasion of the employer's withdrawal from the plan. A plan will not be treated as having the characteristic described in this paragraph merely because, upon cessation of participation in the plan, an employee is provided with the right to convert coverage under a group life insurance contract to coverage under an individual life insurance contract without demonstrating evidence of insurability, but only if there is no additional economic value associated with the conversion right.

Under the BENISTAR 419 Plan, benefits are only payable in the event of the death of an eligible Employee. If the Employee's employment is terminated, the benefits are forfeited, except to the extent State conversion rights exist.

In the event of an Employer's withdrawal from the Plan, assets and liabilities equal to the value of the policies covering the Employer's eligible Employees and the amount of their death benefits may be transferred to another welfare benefit plan willing to accept the transfer. If no such other plan exists, the Employee has no entitlement to a continuation of the benefit or acquisition of any insurance policies except for the right to obtain the policy on his life at its then value. The exchange of a policy for its value is not a distribution of benefits because it is an exchange for adequate consideration. Thus, as required by the Regulations, the Employer's withdrawal from the Plan does not trigger a distribution of benefits.

The Court in <u>Booth vs. Commissioner, 108 T.C. 524 (1997),</u> identified nine specific factors which indicated that the plan at issue was not a single plan but rather was an amalgamation of separate plans.

*"1.    [The plan] was required to maintain separate accounts and a separate accounting for each Employee Group;*

*2.    the Trust Agreement limited an employee's right to benefits under the Prime Plan to the assets of his or her Employee Group;*

*3.    an annual valuation was performed for each Employee Group's account, and an annual valuation has never been performed for the Trust as a whole;*

4. *the summary plan description required by section 102 of ERISA was prepared separately for each Employee Group;*

5. *the arrangement and the adoption agreement signed by each employer were very similar to an arrangement and adoption agreement used by separate employers' establishing a separate plan under the terms of a master plan;*

6. *each employer selected its employees' level of benefits, vesting schedule, and minimum participation requirements, separate and apart from the selections made by the other employers;*

7. *each employer's contribution benefited primarily its employees, and not the employees of other employers;*

8. *the Trust Agreement provided rules under which an employee's benefits would be reduced in the event of a shortfall, and without subsidy from the Trust as a whole; and*

9. *the Prime Plan did not pool all claim risks within the Trust.*[1]

The BENISTAR 419 Plan does not contain any of these features. In Booth, the Tax Court interpreted the word 'plan' in §419A(f)(6) to mean a single pool of funds for use by the group as a whole (e.g. to pay the claims of all participants). The key defect in the plan considered in Booth was that a separate account was kept for each employer with the result that each employer's contributions benefited primarily its own employee group. Another result of the separate accounting was that a participant could not look to all of the trust's assets to pay his benefit. This focus by the Tax Court derived from its interpretation of the legislative history of §419A(f)(6), which mentions that the Section was enacted "because the relationship of a participating employer to a 10 or more employer plan typically resembles the relationship of an insured to an insurer".[2] This analysis suggests that the key element in structuring a 10 or more employer plan to qualify under §419A(f)(6) is shifting the risk of loss from the employer to the plan.

Moreover, the BENISTAR 419 Plan is not substantially similar to the plans described in IRS Notice 95-34. In that Notice the Service, after acknowledging that Section 419A(f)(6) provides an exemption from Sections 419 and 419A, indicated that certain features would cause a plan not to so qualify. Notice 95-34 sets forth four characteristics of plans which do not qualify under §419A(f)(6). These are as follows:

"1) The arrangements may actually be providing deferred compensation. This is an especially important consideration in arrangements similar to that in *Wellons v. Commissioner, 31 F.3d 569 (7th Cir. 1994),* aff'g, *64 T.C.M. (CCH) 1498 (1992),* where the courts held that an arrangement purporting to be a severance pay plan was actually deferred compensation. If the plan is a nonqualified plan of deferred compensation, deductions for contributions will be governed by section 404(a)(5), and contributions to

---

[1] Booth at 571-572.
[2] H.R. Conf. Rep. No. 861, 98th Cong., 2d Sess. 1159 (1984), 1984-3 C.B. (Vol. 2) 1, 413.

the trust may, in some cases, be includible in employees' income under section 402(b). Section 404(a)(5) provides that contributions to a nonqualified plan of deferred compensation are deductible when amounts attributable to the contributions are includible in the employees' income, and that deductions are [*5] allowed only if separate accounts are maintained for each employee."

> The BENISTAR 419 Plan is a death benefit only plan and only pays benefits in the event of the death of an eligible employee or plan participant. Unlike the plan in Wellons, the BENISTAR 419 Plan does not provide for severance, disability or other living benefits which could be construed as a subterfuge for deferred compensation. Additionally, unlike the Wellons case, there is no vesting and the employer's participating in the BENISTAR 419 Plan have no discretion regarding the payment of benefits to eligible employees.

"2) The arrangements may be, in fact, separate plans maintained for each employer. As separate plans, they do not qualify for the 10-or-more employer plan exemption in section 419A(f)(6)."

> The BENISTAR 419 Plan is a single plan and separate plans are not maintained for the individual employers. This is demonstrated by the fact that the Plan files only one Form 1041 and 5500, the Plan does not maintain separate accounts or provide for separate accounting, all assets of the Plan are available to pay all claims, all claims are payable in full in the amount set forth in the adoption agreement without regard to any prospective or retroactive adjustments based upon a particular employer's claims experience. There is no valuation of individual employer accounts, rather, the trust is valued as a whole as indicated in the audited financial statements.

"3) The arrangements may be experience rated with respect to individual employers in form or operation. This is because, among other things, the trust maintains, formally or informally, separate accounting for each employer and the employers have reason to expect that, at least for the most part, their contributions will benefit only their own employees. Arrangements that are experience rated with respect to individual employers do not qualify for the exemption in section 419A(f)(6)."

> There is no separate accounts for individual employers within the BENISTAR 419 Plan. All assets of the Plan are available to pay all claims. Employer contributions are irrevocable and there can never be a refund or reversion to any employer. Employers have no expectation that their contributions will benefit only their own employees.

"4) Even if the arrangements qualify for the exemption in section 419A(f)(6), employer contributions to the arrangements may represent prepaid expenses that are

nondeductible under other sections of the Internal Revenue Code. Taxpayers and their representatives should be aware that the Service has disallowed deductions for contributions to these arrangements and is asserting the positions discussed above in litigation."

**A contribution to the BENISTAR 419 Plan is currently deductible as a prefunding of a welfare benefit plan so long as the contribution is ordinary and reasonable under IRC Section 162.**